# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

---

## No.: 23-2539

---

## JOHN McCROREY

### Plaintiff/Appellant

### v.

## CITY OF PHILADELPHIA

### Defendant/Appellee

---

## APPELLANT'S BRIEF AND APPENDIX (VOLUME ONE)

---

### An Appeal From The Order Granting Defendant City of Philadelphia's Motion For Summary Judgment entered in the U.S. District Court For The Eastern District Of Pennsylvania

---

David M. Koller, Esq. (90119)
**Koller Law LLC**
2043 Locust Street, Suite 1-B
Philadelphia, PA 19103
T: (215) 545-8917
F: (215) 575-0826
davidk@kollerlawfirm.com
Attorney for Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ..... 1

STATEMENT OF ISSUES PRESENTED.................................................................. 1

STATEMENT OF THE CASE ...................................................................................... 2

STATEMENT OF RELEVANT FACTS..................................................................... 2

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................. 5

STATEMENT OF THE STANDARD OF REVIEW .................................................. 6

SUMMARY OF THE ARGUMENT............................................................................. 7

ARGUMENT.................................................................................................................. 9

I.    APPELLEE WAS NOT ENTITLED TO SUMMARY JUDGMENT ON
APPELLANT'S AGE DISCRIMIANTION CLAIMS UNDER THE ADEA
AND THE PHRA BECAUSE GENUINE DISPUTES OF MATERAIL FACT
EXISTED AS TO WHETHER APPELLANT ESTABLISEHD A *PRIMA FACIE*
CLAIM OF AGE DISCRIMINATION.................................................................. 9

II.  THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S
RETALIATION CLAIMS BECAUASE APPELLANT PRESENTED A PRIMA
FACIE CASE OF RETALIATION UNDER THE ADEA AND PHRA.. ..........22

CONCLUSION............................................................................................................. 27

COMBINED CERTIFICATIONS.............................................................................. 28

CERTIFICATE OF SERVICE .................................................................................. 30

APPENDIX TABLE OF CONTENTS....................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Supreme Court*

Burlington Northern & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006)...........23

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..........................................................6

*Circuit Courts of Appeals*

Alvarado v. Texas Rangers, 492 F.3d 605 (5th Cir. 2007)................................11, 12

Armbruster v. Unisys Corp., 32 F.3d 768 (3d Cir. 2001)...........................................7

Beyer v. County of Nassau. 524 F.3d 160 (2d Cir. 2008) ...........................13, 14, 18

Bulifant v. Del. River & Bay Auth., 698 F. App'x 660 (3d Cir. 2017)...................23

Click v. Copeland, 970 F.2d 106 (5th Cir. 1992)......................................................14

Collins v. State of Illinois, 830 F.2d 692 (7th Cir. 1987)...................................10, 11

Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005)........................................................23

Giles v. Kearney, 571 F.3d 318 (3d Cir. 2009).........................................................6

Hampton v. Borough of Tinton Falls Police, 98 F.3d 107 (3d Cir. 1996)...............19

Lore v. City of Syracuse, 670 F.3d 127 (2d Cir. 2012) .....................................12, 13

Marzano v. Computer Sci. Corp., Inc., 91 F.3d 497 (3d Cir. 1996).........................7

Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368 (3d Cir. 1991).......7

Ortiz-Diaz v. U.S. Department of Housing & Urban Dev., 867 F.3d 70 (D.C. Cir. 2016) ...........................................................................................................11, 16

Pignataro v. Port Auth. Of N.Y. & N.J., 593 F.2d 265 (3d Cir. 2010).....................6

Santini v. Fuentes, 795 F.3d 410 (3d Cir. 2015).......................................................6

Scheidemantle v. Slippery Rock U. State Sys., 470 F.3d 535 (3d Cir. 2006)...........9

Sec'y U.S. Dep't. of Labor v. Kwansy, 853 F.3d 87 (3d Cir. 2017).........................6

Smith v. City of Allentown, 589 F.3d 684 (3d Cir. 2009)..........................................9

Stewart v. Rutgers, 120 F.3d 426 (3d Cir. 1997).................................................7, 10

Swain v. City of Vineland, 457 Fed. Appx. 107 (3d Cir. 2012)...............................21

Torre v. Casio, Inc., 42 F.3d 825 (3d Cir. 1994) ....................................................20

U.S. v. 107.9 Acre Parcel of Land in Warren Twp., 898 F.2d 396 (3d Cir. 1990) ...6

### *United States District Courts*

Albright v. City of Philadelphia, 399 F. Supp.2d 575 (E.D. Pa. 2005)...................23

Muldoon v. City of Philadelphia, No. 22-1929, 2023 U.S. Dist. LEXIS 59711 (E.D. Pa. Apr. 5, 2023)...................................................................................................17

Schuck v. City of Philadelphia, No. 22-2124, U.S. Dist. LEXIS 82519 (E.D. Pa. May 11, 2023)...................................................................................................17

Sowell v. Kelly Servs., Inc., 139 F. Supp. 3d 684 (E.D. Pa. 2015)...........................7

### **Statutes**

28 U.S.C. § 1291 .......................................................................................................1

28 U.S.C. § 1331 and 1367(a)...................................................................................1

28 U.S.C. § 1367(a) ..................................................................................................1

Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ............................1

Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. § 951 .........................1

### **Rules**

Fed. R. Civ. P. 56 .....................................................................................................1

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Plaintiff/Appellant John McCrorey (hereinafter "Appellant" or "McCrorey")

appeals the July 26, 2023, Order from the United States District Court for the

Eastern District of Pennsylvania granting the Motion for Summary Judgment,

under the provision of Fed. R. Civ. P. 56, of Defendant/Appellee City of

Philadelphia (hereinafter "Appellee" or "City of Philadelphia") on Appellant's

claims of discrimination and retaliation in violation of the Age Discrimination in

Employment Act, 29 U.S.C. § 621 *et seq.*, ("ADEA") and the Pennsylvania Human

Relations Act, 43 Pa. Cons. Stat. Ann. § 951, ("PHRA"). The district court had

original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367(a), as

the action arose under the laws of the United States, and supplemental jurisdiction

was invoked for the state law claims. This Honorable Court has appellate

jurisdiction under 28 U.S.C. § 1291 because the matter is an appeal from a final

decision of the district court.

## STATEMENT OF ISSUES PRESENTED

1) Whether the Trial Court erred in granting City of Philadelphia's Motion

for Summary Judgment on McCrorey's claims of age discrimination when

McCrorey did establish genuine issues of material fact precluding summary

judgment and requiring resolution by a factfinder at trial.

2) Whether the Trial Court erred in granting City of Philadelphia's Motion

for Summary Judgment on McCrorey's claims of retaliation when McCrorey did establish genuine issues of material fact requiring resolution by a factfinder at trial.

## STATEMENT OF THE CASE

## STATEMENT OF RELEVANT FACTS

The facts relevant to this appeal as it relates to Appellant's claims of discrimination and retaliation, when taken in the light most favorable to Appellant as the non-moving party during the summary judgment motion, are as follows:

Appellant was a police officer at Appellee from 1982 until his retirement in 2021. Appx004. Appellant was assigned as a lieutenant and supervisor in the NFU, which is a branch of Appellee's police department responsible for the enforcement of drug laws. Appx004-005. The NFU is divided into six squads which cover six divisions across the City of Philadelphia: South, Southwest, Central, North, Northeast, and East. Appx005. Appellant had been assigned as the lieutenant and supervisor of East Squad, which included purview over Kensington –the largest open-air drug market on the East Coast of the United States. Appx005.

Chief Christopher Flacco became the Chief inspector of the Narcotics Bureau in or around July 2020, which included supervision over the NFU. Appx005. As a result,  Chief Flacco became a part of Appellant's supervisory chain. At the time of Chief Flacco's appointment, Appellant was enrolled in the Deferred Retirement Option Program ("DROP"), with a retirement date of October

2

23, 2021. Appx006.

Chief Flacco held a supervisors meeting on or about September 22, 202,
where he commented about how old the supervisors and personnel were that were
assigned to the unit and inquired into whom in the unit was enrolled in the DROP.
Appx007. Appellant as well as Sergeant Schuck, and Lieutenant Muldoon, co-
workers of Appellant in the NFU who also brought claims of age discrimination
and retaliation, all raised their hands. Appx007. During this and other meetings,
Chief Flacco made ageist statements such as "the police force [does not need] a
bunch of fifty-year-old cops in uniform acting as an [Emergency Response
Group]," he did not need "50-year old people . . . doing warrants, conducting
warrants and chasing people," "[W]e need younger guys in here. We need to
[bring] the average [age] down," and that he was trying to get younger officers or
supervisors into the field unit. Appx007, 366, 369.

Chief Flacco was conducting a reorganization of the squads and members in
or around September 2022. Appx007. Appellant heard Chief Flacco state that he,
Sergeant Schuck, and Lieutenant Muldoon would not be considered for the East
squad job because they were the oldest supervisors in the NFU. Appx368. In fact,
Inspector Merrick (who was Captain Merrick and Appellant's supervisor at the
time) testified that, based on his observations of, and interactions with, Chief
Flacco, the only reason Chief Flacco removed Appellant from his assignment was

3

because of Appellant's age and enrollment in the DROP. Appx366. Ultimately,

Chief Flacco removed all of Appellant's squad, all over fifty years old, from East

Division and reassigned Appellant, sixty-one years old, to supervise Northwest

squad. Appx007. Although there was no base salary change, East squad had

significantly more opportunities for overtime than the other squads because there

were more investigations and more individuals to supervise, meaning more

overtime would be generated. Appx007-008. East squad also carried with it a

higher level of prestige as it was innovative, desirable, and esteemed given that it

was part of a new, advanced drug enforcement approach and would have given

Appellant more visibility and boosted his career. Appx007-008.

After being reassigned, Appellant went on sick leave. Appx009. During his

sick leave, Appellant filed a Charge of Discrimination with the Equal Employment

Opportunity Commission on or about February 23, 2021. Appx009. Appellant

requested an extension of his DROP date by one-year on or about July 9, 2021,

following a call for extensions issued by the Mayor of Philadelphia. Appx009-010.

Appellee denied Appellant's DROP extension request on or about July 27, 2021.

Appx011. Only four individuals had their DROP extension requests denied in

Fiscal Year 2022. Appx274. After the denial of his DROP extension request,

Appellant retired from Appellee on October 23, 2021. Appx012.

4

## PROCEDURAL HISTORY

Appellant initiated this action against Appellee, his former employer, in District Court via Complaint filed on or about June 6, 2022, asserting claims of violations of the ADEA and the PHRA for age discrimination and retaliation in connection with his employment as a police officer with Appellee's Narcotics Field Unit ("NFU"). Appx035. Appellee filed an Answer with Affirmative Defenses on or about September 12, 2022. Appx046. At the close of discovery, Appellee filed a Motion for Summary Judgment. Appx31. On July 26, 2023, Judge Chad F. Kenney issued a Memorandum Opinion and Order granting Appellee's motion and dismissing all claims with prejudice. Appx003-028.

Appellant timely filed a Notice of Appeal of the July 26, 2023 Order and Opinion with the Trial Court on or about August 23, 2023. Appx001.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This instant case is before this Court for the first time. Counsel is unaware of any related case decided or pending before this Court. Two related cases with the same or substantially similar underlying facts were raised by separate plaintiffs and former co-workers of Appellant in District Court in the Eastern District of Pennsylvania: Muldoon v. City of Philadelphia, No. 22-1929; and Schuck v. City of Philadelphia, No. 22-2124. Appellant, Muldoon, and Schuck were all co-workers at Appellee and alleged similar claims of age discrimination and

5

retaliation involving the same supervisor at Appellee.

## STATEMENT OF THE STANDARD OF REVIEW

An appellate court's review of a grant of summary judgment is plenary, with the appellate court applying the same test that the district court used in determining whether summary judgment was proper. Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009) Summary judgment is only appropriate where, construing all evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Sec'y U.S. Dep't. of Labor v. Kwansy, 853 F.3d 87, 90 (3d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). It is not the Court's job to "weigh the evidence and determine the truth of the matter, but only to determine whether there is a genuine issue for trial." Id. (quoting Santini v. Fuentes, 795 F.3d 410 (3d Cir. 2015)).

A party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying aspects of the record which it believes demonstrates the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the party makes this initial showing, the burden shifts to the nonmoving party to demonstrate that there is, actually, a genuine dispute of material fact. U.S. v. 107.9 Acre Parcel of Land in Warren Twp., 898 F.2d 396, 398 (3d Cir. 1990). The nonmoving party, in meeting its burden, is entitled to all reasonable inferences in its favor. Pignataro v. Port Auth. Of N.Y. &

N.J., 593 F.2d 265, 268 (3d Cir. 2010).

In determining the existence of a genuine dispute as to any material fact, the "court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 2001). Summary judgment also must be denied if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed. Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368 (3d Cir. 1991). In employment discrimination cases, the summary judgment standard "is applied with added rigor . . . [because] intent and credibility are crucial issues." Sowell v. Kelly Servs., Inc., 139 F. Supp. 3d 684, 690 (E.D. Pa. 2015) (quoting Stewart v. Rutgers, 120 F.3d 426 (3d Cir. 1997)). Given the inherent evidentiary question of credibility of an employer's stated reason and whether that reason is pretext, summary judgment is rarely appropriate in this type of case. See id. (citing Marzano v. Computer Sci. Corp., Inc., 91 F.3d 497, 509 (3d Cir. 1996)). Simply pointing to evidence which calls into question the defendant's intent raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment. Marzano, 91 F.3d at 509-10.

## **SUMMARY OF THE ARGUMENT**

Appellee was not entitled to summary judgment in its favor, and Appellant respectfully submits this Court should reverse the Trial Court's grant of summary

7

judgment and remand this matter for trial. The Trial Court reasoned that Appellant could not, as a matter of law, establish the elements of a *prima facie* age discrimination case, because he did not suffer an adverse employment action. However, the facts and the reasonable inferences drawn therefrom revealed genuine disputes as to whether Appellant met his burden. There was ample record evidence that moving Appellant off the revamped East squad to the Northwest squad resulted in a substantial loss of opportunities which qualified as an adverse employment action. A rational jury could have found that working on the reorganized East squad was objectively better and more prestigious, such that removing Appellant from his position constituted an adverse employment action.

Moreover, the Trial Court erred by granting Appellee's motion for summary judgment on the retaliation claims. The Trial Court found the denial of Appellant's DROP extension application failed to qualify as an adverse employment action. It further ruled that Appellant could not prove a causal connection between the filing of his EEOC charge and the denial of his DROP extension. Yet, the Trial Court made impermissible credibility and factual determinations and used an inappropriate standard of "adverse employment action" instead of the appropriate "materially adverse action" standard. A jury could have found that Appellant was able to work during the extension period, and disputed facts existed as to a retaliatory motive in denying the application. Appellant respectfully submits that

8

summary judgment was not proper, the Trial Court's ruling should be reversed, and this matter should be remanded to the Trial Court for trial.

## **ARGUMENT**

### I. **APPELLEE WAS NOT ENTITLED TO SUMMARY JUDGMENT ON APPELLANT'S AGE DISCRIMIANTION CLAIMS UNDER THE ADEA AND THE PHRA BECAUSE GENUINE DISPUTES OF MATERAIL FACT EXISTED AS TO WHETHER APPELLANT ESTABLISEHD A *PRIMA FACIE* CLAIM OF AGE DISCRIMINATION.**

Appellant's age discrimination claim required him to set forth a *prima facie* claim and then present evidence that Appellee's asserted reasons for removing him from the East squad were pretextual. See, e.g., Smith v. City of Allentown, 589 F.3d 684, 690 (3d Cir. 2009). A plaintiff establishes a successful *prima face* age discrimination claim with evidence that (1) he was at least 40 years old; (2) defendant took an adverse employment action against him; (3) he was qualified for the position; and (4) defendant replaced him with a sufficiently younger person to support an inference of discrimination. Id. at 689.

Initially, it is well-settled that the level of proof required to prove a *prima facie* discrimination case is low. Scheidemantle v. Slippery Rock U. State Sys., 470 F.3d 535, 539 (3d Cir. 2006). The Trial Court agreed that Appellant established the first and third elements of the case, but found he failed to prove Appellee took an adverse employment action against him. As such, it held there was no *prima facie* case as a matter of law and never reached the fourth element of the analysis or

9

whether Appellee's alleged reasons for transferring Appellant were pretextual for unlawful age discrimination. In so ruling, the Trial Court made impermissible credibility and factual assessments that were for the jury's determination. Indeed, this Court has recognized that the summary judgment standard should be "applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Stewart, 120 F.3d at 431 (other citations omitted). Whether Appellant suffered an adverse employment action when he was removed from the East squad and assigned to a less prestigious squad with fewer opportunities and visibility involved fact sensitive inquiries that fell squarely within the jury's province and should not have been decided on summary judgment.

Appellee argued that Appellant's transfer to the Northwest squad did not result in any reduction in pay, benefits, or title or any significant change of duties. Yet, the circuit courts of appeal agree that an adverse employment action can occur even without any decrease in pay, benefits, title, or grade. Indeed, in Collins v. State of Illinois, the court surveyed cases from the various circuits and concluded that "several courts have found an adverse job action, for purposes of discrimination or retaliation, in a lateral transfer even where the transfer did not result in a reduction of pay or benefits." 830 F.2d 692, 702-03 (7th Cir. 1987). Noting that adverse employment consequences are not limited solely to monetary considerations, the Seventh Circuit acknowledged that an employer could make a

10

job undesirable without pay or benefits being a factor:

> We believe adverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well. For example, other courts have found adverse job impact, where there was no reduction in salary or benefits, in any employer's moving an employee's office to an undesirable location, transferring an employee to an isolated corner of the workplace, and requiring an employee to relocate her personal files while forbidding her to use the firm's stationary and support services.

Id. at 703-04; see also Ortiz-Diaz v. U.S. Department of Housing & Urban Dev., 867 F.3d 70, 74 (D.C. Cir. 2016) (explaining that discriminatory denial of lateral transfer can qualify as adverse employment action if the denial negatively affected the employee's prospects to advance his career and recognizing that "[p]recedent of our sister circuits is to the same effect").

Pertinent to this case, many courts have found issues of fact for a jury as to whether lateral transfers for police officers were materially adverse. For instance, in Alvarado v. Texas Rangers, the Fifth Circuit recognized that a transfer can constitute a demotion even in the absence of a cut in pay, title, or grade if the new position lacks prestige or less opportunity for advancement. 492 F.3d 605, 613 (5th Cir. 2007). In Alvarado, the plaintiff, a sergeant in defendant's special crimes service, alleged gender discrimination in connection with the denial of an appointment to a sergeant position in defendant's rangers division. Similar to this case, the district court granted summary judgment to defendant, finding no adverse

11

employment action, because the sergeant position in the rangers was a lateral transfer. The plaintiff argued on appeal, however, that a reasonable jury could find the non-selection akin to the denial of a promotion. Id. at 612. The Fifth Circuit agreed and found summary judgment improper. Noting that a decrease in pay, rank, or benefits was not dispositive, the court explained that if the new position was objectively better, then a failure to receive such a position could qualify as an adverse employment action. Id. at 614. Since the plaintiff presented evidence that the rangers was an elite unit within defendant that handled high-profile cases and carried strong competition to receive the position, a genuine issue of material fact existed on whether the failure to receive the position constituted an adverse employment action. Id. at 615.

Similarly, in Lore v. City of Syracuse, the Second Circuit ruled that the district court improperly found no adverse employment action as a matter of law. 670 F.3d 127 (2d Cir. 2012). The plaintiff in Lore worked for the city's police department as a public information officer, essentially serving as the department's spokesperson. In May 1999, the plaintiff was removed from her position and transferred in June 1999 to the department's technical operations section and then to the uniform patrol division in August 1999. The plaintiff alleged the transfers were discriminatory. Id. at 142. The district court granted summary judgment, finding no adverse employment action through lateral transfers that contained no

reduction in pay, benefits, or responsibilities and no change in schedule. Id. at 170. The Second Circuit found that despite the lack of those changes, a rational jury still could find that a reasonable police officer would view a transfer to a less prestigious position with fewer opportunities for growth as materially adverse. Since the plaintiff presented evidence that her public information officer position entailed an assignment to the police chief and dealings with the media while the two subsequent positions involved mere busy work and supervision of uniformed patrol, disputed facts existed on the issue of material adversity. Id. at 171. The trial court should have allowed the jury to decide those facts and erred in concluding as a matter of law that the transfers did not qualify as adverse employment actions.

The Second Circuit found a similar error in taking the determination of an adverse employment action from the jury in Beyer v. County of Nassau. 524 F.3d 160 (2d Cir. 2008). In that case, the police detective plaintiff worked in the department's serology section analyzing blood and bodily fluids recovered from crime scenes. As the department began outsourcing the DNA analyses, the plaintiff applied, on several occasions, for a lateral transfer to the department's latent fingerprint section. Her application was denied, and she claimed gender discrimination. Id. at 162. It was undisputed that the transfer would not have resulted in any increased pay or title, and defendant argued that the serology section, with a requirement of more scientific training than the fingerprint

13

assignment, was not objectively disadvantageous. Id. at 164. The court held that the trial court wrongly granted summary judgment as a reasonable jury could find the job plaintiff sought objectively better. It noted the competitive process to get into the fingerprint section, the use of new equipment and skills in the fingerprint section, the increased outsourcing of the serology section work, and the outdated methodology and technology in the serology section. Id. Those factors would have allowed a jury to find the latent fingerprint section was more desirable, such that denying the transfer qualified as an adverse employment action. Id.; see also Click v. Copeland, 970 F.2d 106, 110 (5th Cir. 1992) (trial court incorrectly found that plaintiffs' lateral transfers from law enforcement officers to jail guards could not constitute adverse employment actions as a matter of law when the evidence demonstrated that jobs in the jail sector were not as prestigious as positions in law enforcement).

In this case, Appellant adduced sufficient evidence for a reasonable jury to find that the reorganized East squad was objectively better than the Northwest squad. First, Appellant testified as to the increased opportunities for overtime in the East squad. He explained "being assigned to the east squad would have definitely generated more investigative and arrest overtime than in northwest – one, on the basis of the scope and area of the investigations, as well as the more people you're supervising, the more investigations are going to open, the more investigative

14

overtime is going to be generated." Appx210. Chief Flacco, Appellant's supervisor, corroborated that the revamped East squad would focus on longer investigations designed to get the suppliers, caseworkers, and stash houses. Appx116. A jury could infer from such testimony that longer and more comprehensive investigations would require more manpower hours and overtime opportunities. In fact, Chief Flacco testified that requests for overtime had to be to further an investigation. Appx136. Although Appellee will argue that Chief Flacco intended to decrease overtime hours in the NFU, his testimony about the broader scope of investigations and the allowance of overtime only to further investigations allows a jury to discount his intent and find that there was more potential for overtime in the reorganized East squad. Second, Appellant testified that the Northwest squad decreased from ten officers to five officers upon his move to that squad. Appx208. He explained that the Northwest unit deserved to have ten officers, and the East squad had "twenty new people and three new supervisors." Appx208. A reasonable jury could find that a smaller, less comprehensive Northwest squad was inferior to the East squad and would not operate as well.

Third, there was ample evidence that the new East squad was substantially more prestigious with potential for career advancement, and its innovative nature was widely known. Inspector Taylor, another of Plaintiff's supervisors, testified that Chief Flacco used the East division for a different drug enforcement strategy.

15

Appx382. Chief Flacco also testified at length about his vision for the reorganized East squad and how it would be a very different operation than the other divisions. Appx116. He explained that the new East squad would focus on a new plan of attack for drug enforcement that involved going "up the chain" to get suppliers, caseworkers, and stash houses. Appx116. He wanted to broaden the investigations to "take down the organization" as a whole and really impact drug trafficking in the city. Appx116. The East squad included Kensington, which housed the largest open-air drug market on the East coast of the United States. Appx062.  Chief Flacco perceived the East division as "the mecca of narcotics," and he wanted to attack that division. Appx443.

Tackling the rampant drug trafficking in Kensington as part of the esteemed new East squad would have increased Appellant's visibility as a police officer. Overall, leading such a groundbreaking, high profile squad would have allowed Appellant an opportunity to enhance his skill set and boost his career. Just as the court found in Ortiz-Diaz that the denial of a lateral transfer that unfavorably affected an employee's potential to further his career could constitute an adverse employment action, Appellant's non-selection to the new East squad lieutenant position negatively impacted his career and qualified as an adverse job action. Ortiz-Diaz, 867 F.3d at 74

Appellee argued that Appellant subjectively perceived the East squad as

16

better, which was insufficient to establish material adversity. However, there was more than Appellant's own opinion regarding the desirability of the East squad. In Alvarada, the defendant argued that the plaintiff's own view of the rangers position as more appealing was not sufficient, but the court found more evidence beyond the subjective perception. 492 F.3d at 615. In this case, there was more evidence beyond Appellant's own estimation of the East squad's allure. Lieutenant Robert Muldoon and Sergeant James Schuck, in their cases challenging the same or similar actions against them by Chief Flacco during their employment at Appellee, also viewed supervisory positions in the East squad as more appealing. In fact, the district courts in Muldoon and Schuck's cases denied summary judgment, finding disputed issues of fact as to whether they suffered adverse employment actions by being passed over for supervisory positions in the East squad. See Muldoon v. City of Philadelphia, No. 22-1929, 2023 U.S. Dist. LEXIS 59711 *3 (E.D. Pa. Apr. 5, 2023) (Bartle, J.) (Appx478); Schuck v. City of Philadelphia, No. 22-2124, U.S. Dist. LEXIS 82519 *3, *3 n.3 (E.D. Pa. May 11, 2023) (Perez, J.) (Appx480).

Other indicia of desirability existed as well, such as the intricate and careful process involved in choosing the supervisors of the revamped, important East squad. Chief Flacco acknowledged that "[E]ast is a very different drug operation than northeast or southwest or south." Appx116. Chief Flacco evaluated the NFU for several months prior to selecting a new lieutenant for the East squad. Appx380-

381. He had numerous discussions with Inspector Taylor and Captain Merrick about who was worthy to lead the East squad. Appx381, Appx104. Captain Merrick, Inspector Taylor, and Lieutenant Gillespie gathered together and graded the candidates. Appx428. Appellee ultimately chose just one person, Lieutenant Newsome, to lead the East squad. Appx429. As in Beyer, where the court relied on the competitive selection process for the fingerprint section as a factor showing the objective desirability of that assignment, the competitive and driven process to be chosen as lieutenant of the East squad demonstrates the objective prestige and superiority of the East squad. Beyer, 524 F.3d at 164.

All these factors point to a finding that the East squad was objectively desirable. Appellee used an extensive, competitive process to select the one new lieutenant for the Esat squad. The East squad focused on an innovative, ground breaking strategy, which required an enhanced skill set and would result in increased visibility and career opportunities for its leaders and officers. Sufficient evidence of the East squad's prestige existed, and a jury could have objectively tangible harm by taking Appellant out of that squad and placing him in the Northwest squad. The Trial Court improperly infringed on the jury's role by making the determination of objective desirability as matter of law.

The district courts in Muldoon and Schuck considered relevant Third Circuit law and found disputed issues of fact existed as to whether non-selection as

18

lieutenant and sergeant of the East squad constituted adverse employment actions.

For instance, in Hampton v. Borough of Tinton Falls Police, 98 F.3d 107 (3d Cir.

1996), cited by the courts in Muldoon and Schuck, this Court found the trial court

failed to consider whether an involuntary transfer of a police officer from the

detective bureau to road patrol qualified as an adverse employment action.

Although there was no change in rank or pay and the transfer was part of a routine

rotation schedule, the court noted that the plaintiff claimed it was a less desirable

assignment. Hampton, 98 F.3d at 116. This Court concluded that a jury should

have determined the significance of the plaintiff's assertion of desirability, and

summary judgment was not proper. Id. The court in Muldoon cited Hampton in

support of its finding that Muldoon's removal from the Northeast squad could be

considered an adverse employment action with evidence that the new position was

less desirable. Muldoon, 2023 U.S. Dist. LEXIS 59711 *3. Appx478.

The Trial Court found Appellant failed to establish a prestige-based

argument like the officer in Hampton. However, as shown above, disputed facts

existed on this issue. Drawing all inferences from the testimony in Appellant's

favor, there was evidence as to the competitive selection process of the East squad

lieutenant position, the novel approach to drug enforcement in the East squad, the

potential for the East squad to impact drug trafficking in the city with high

visibility for the supervisory team in the squad, the broader investigative strategy

19

which carried an enhanced skill set and a potential for overtime, the move from a high drug trafficking area to a smaller squad with less officers and support, and the overall new image of the East squad. Taken together, a jury could find that the East squad presented better opportunities and was more prestigious and desirable.

The district courts in <u>Muldoon</u> and <u>Schuck</u> also relied on <u>Torre v. Casio, Inc.</u>, 42 F.3d 825 (3d Cir. 1994), in finding disputed issues of fact sufficient to deny the City's motions for summary judgment. The plaintiff in <u>Torre</u>, a regional sales manager, claimed defendant discriminated against him on the basis of age when, among other actions, it transferred him to a product marketing manager position. <u>Torre</u>, 42 F.3d at 827. On appeal of the district court's grant of summary judgment to defendant on the ADEA claim, the court noted that there was no reduction in pay in the new position, and the plaintiff couched his new position as more comprehensive than his prior sales manager job. Moreover, the new job was arguably better because it did not require travel. <u>Id</u>. at 831, n. 7. Yet, even with those factors, the court found a material issue of fact on whether the transfer resulted in an adverse employment action. <u>Id</u>.

The Trial Court in the instant matter found <u>Torre</u> inapposite in Appellant's case because the plaintiff there was transferred to a "dead-end job" while Appellant continued to work in one of the NFU's geographical regions. Appx021 (<u>citing</u> <u>Torre</u>, 42 F.3d at 827-28). Yet, Captain Merrick testified that Chief Flacco

20

removed Appellant from the newly organized East squad, because Chief Flacco

wanted younger lieutenants in particular groups and the older lieutenants were not

included in Chief Flacco's new plans and vision. Appx427. A jury could infer from

this testimony that Chief Flacco did not envision real roles for Appellant and the

other older lieutenants and placed them in other squads as "dead-end" types of

jobs. In short, a jury could find that like the plaintiff in Torre, Appellant's new job

in the Northwest squad was a standstill position for him to wait out his days until

retirement. Sufficient evidence existed for a jury to find the transfer qualified as an

adverse employment action.

The Trial Court analogized Appellant's transfer out of the East squad to the

police officer in Swain v. City of Vineland, 457 Fed. Appx. 107 (3d Cir. 2012),

where the court found no adverse employment action in the failure to assign the

officer to the K-9 unit. Appx020. However, Appellant presented more evidence of

adversity than was present in Swain. In that case, the plaintiff/police officer

claimed age discrimination based on the rejection of his application for the K-9

unit. While the plaintiff argued that the K-9 unit represented a "specialized

endeavor," he did not contend that his prestige would have changed with the

transfer, and there was no evidence that the position was objectively better. By

contrast, Appellant demonstrated that assignment to the revised East squad carried

prestige. As discussed above, he presented evidence showing the objective

21

desirability of the East squad through testimony about its innovativeness, visibility, selective process, and other factors.

In short, there was sufficient evidence for the jury to find that Appellant suffered a tangible harm by his removal from the East squad and non-selection as the lieutenant for the revamped East squad. Disputed issues of fact existed as to whether the new East squad was objectively better than the Northwest squad and on the impact of Appellee's decision on Appellant's career prospects. The Trial Court should have allowed the jury to evaluate credibility and determine the disputed facts rather than making a summary decision that Appellant did not sustain an adverse employment action. Appellant respectfully submits that the grant of summary judgment to Appellee was not proper, should be reversed, and this matter remanded to the Trial Court for trial.

## II. THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S RETALIATION CLAIMS BECAUSE APPELLANT PRESENTED A *PRIMA FACIE* CASE OF RETALIATION UNDER THE ADEA AND PHRA.

The Trial Court used the incorrect standard in determining Appellant failed to establish a *prima facie* claim of retaliation and, in doing so, erroneously granted summary judgment to Appellee. The Trial Court determined that Appellant failed to establish genuine issues of material fact related to him being subjected to an adverse employment action contemporaneous with or following his EEOC complaint or that his EEOC complaint caused the adverse employment action.

To establish a retaliation claim under the ADEA and the PRHA, a plaintiff must show (1) engagement in a protected activity; (2) adverse action subsequent to or contemporaneous with the protected activity; and (3) a causal connection between the adverse action and the protected activity. Bulifant v. Del. River & Bay Auth., 698 F. App'x 660, 665-66 (3d Cir. 2017) (citing Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005)). Job consequences that qualified as adverse employment actions for the discrimination claim also constitute adverse employment actions for the retaliation claim; yet, in the context of a retaliation claim, substantially more conduct is included. In fact, it is well-settled that the definition of an adverse employment action in the context of a retaliation claim is broader and encompasses more conduct than that required for a discrimination claim. In a retaliation claim, an adverse employment action is something that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" Burlington Northern & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006)); see also Albright v. City of Philadelphia, 399 F. Supp.2d 575, 590 (E.D. Pa. 2005) (noting that the same evidence of an adverse employment action for a discrimination claim can be used for a retaliation claim).

Appellant filed an EEOC Charge February 23, 2021. Appx353. Appellant applied for the DROP extension in July 2021. Appx257. In this request, he was exercising his "one-time option" to extend his participation in DROP for one

23

additional year. Appx468. The requested an extension of his DROP date would have changed his retirement date from October 23, 2021 to October 23, 2022. Appx468. Appellant exercised this option in July 2021. Appx357. During this time, Appellant was out on medical leave for conditions connected with Chief Flacco's conduct and behavior; specifically, the discriminatory act of removing him as Lieutenant of East Squad. Appx347-352, 367. Although Appellant certified he would be able to return to work during the period of his DROP extension, his extension request was denied because Appellant was allegedly not "currently able or available to work." Appx467-471. This conflicted with the requirements listed in the DROP Extension Election Form. Appx468-471. The form only required Appellant be able and available to work during the extension period. Appx468-471 Lieutenant Ferguson testified that the period of extension would not have started until October 23, 2021. Appx281-282. Lieutenant Ferguson's stated reasoning for determining that Plaintiff was going to continue to be unavailable for work was based only on a database list and at no point was any effort made to reach out to him to determine if he would be available for work.

Instead, the inference could be drawn that Appellee took advantage of the fact that Appellant was at that moment out on leave to force an older employee out and deprive him of his ability to "exercise [his] one-time option to extend [his] participation in the DROP." Appx467-470. Appellant received a phone call from

24

an individual working at Appellee informing him that Chief Flacco was attempting to get rid of Appellant by denying his DROP extension. Appx360. As discussed above, Chief Flacco's animosity and discriminatory acts could allow a factfinder to disbelieve Chief Flacco's testimony regarding a lack of involvement in the process or attempt to influence the process and believe Appellant's interpretation of events. This would result in a finding of pretext for the stated reasoning for denial. This coupled with the stated reason for denial that did not match up with the extension request documentation should have been enough to defeat summary judgment.

Further, the Trial Court erroneously concluded that the denial of Appellant's DROP extension application did not seriously alter Appellant's compensation, terms, conditions, or privileges of employment. While the Trial Court focused on the fact that there was no guarantee that a request to extend the retirement date would be granted, all but four requests were granted and offered those who requested said extensions an additional year of compensation in the position. Appx360-361. A jury could infer retaliatory animus towards Appellant since almost all requests were granted, with Appellant being one of the few exceptions. It was an inappropriate conclusion of fact by the Trial Court to determine that this denial was not an adverse employment action in the framework of a retaliation claim. The Trial Court further concludes that Appellant never would have been

accepted since he was not presently working; yet this too required a credibility determination.

Appellant certified that he was ready and available to work and, had anyone reached out to him, he would have confirmed that. The Trial Court inappropriately conducted a weight analysis of the evidence instead of allowing the matter to properly proceed to have such disputed facts resolved by a factfinder at trial. As such, summary judgment should have been denied.

Appellant also established genuine issues of material fact as it related to decisionmakers being aware of Appellant's EEOC complaint at the time the decision was made. Appellant testified that he received a phone call from an individual working at Appellee informing him that Chief Flacco was attempting to get rid of Appellant by denying his DROP extension. Appx360. This connected with Lieutenant Ferguson's testimony that no one made attempts to contact Appellant to determine his ability to return to work could allow a reasonable jury to infer that Appellee took advantage of a situation to deny Appellant's request in retaliation for his EEOC complaint.

For all of the reasons stated above, Appellee's Motion for Summary Judgment as to Appellant's Retaliation claims should have been denied and this Court should reverse the decision of the Trial Court and remand this matter for trial.

## CONCLUSION

It was error to grant summary judgment and deprive a jury from its role as factfinder to make the conclusions ultimately made by the Trial Court below. Appellant respectfully requests this Honorable Court vacate the order of the Trial Court granting summary judgment and remand this matter to the Trial Court for trial.

Respectfully submitted,

**KOLLER LAW, LLC**

Dated: February 12, 2024        By: /s/ David M. Koller
David M. Koller, Esquire (90119)
Attorney for Appellant John McCrorey

## COMBINED CERTIFICATIONS

### Certificate of Bar Membership

I, DAVID M. KOLLER, hereby certify that I am admitted to the Bar of the

United States Court of Appeals for the Third Circuit.

**KOLLER LAW, LLC**

Dated: February 12, 2024         By:      /s/ David M. Koller
                                          David M. Koller, Esquire (90119)
                                          Attorney for Appellant

### Identical Compliance Certification

I, DAVID M. KOLLER, hereby certify on this day, <u>February 12, 2024</u>, that

the text of the electronic brief and hard copies are identical.

**KOLLER LAW, LLC**

Dated: February 12, 2024         By:      /s/ David M. Koller
                                          David M. Koller, Esquire (90119)
                                          Attorney for Appellant

### Virus Check Certification

I, DAVID M. KOLLER, hereby certify on this day, <u>February 12, 2024</u>, that a

virus check was performed on the electronic brief version of this brief utilizing the

virus check that KOLLER LAW LLC's computer system utilizes.

**KOLLER LAW, LLC**

Dated: February 12, 2024         By:      /s/ David M. Koller
                                          David M. Koller, Esquire (90119)
                                          Attorney for Appellant

28

## **Certification of Compliance with Page Limitation, Typeface Requirements, and Type Style Requirements**

The foregoing Brief complies with the limitations established in Fed. R. App. P. 32(a)(7)(A) because this brief complies with Fed. R. App. P. 32(a)(7)(B)(i) as it contains 6,353 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). In preparing this certification, I relied on the page count function of Microsoft Word, the word-processing system used to prepare the foregoing Brief.

The foregoing Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word: 14-point Times New Roman font.

**KOLLER LAW, LLC**

Dated: February 12, 2024        By:       /s/ David M. Koller
                                                    David M. Koller, Esquire (90119)
                                                    Attorney for Appellant

29

## CERTIFICATE OF SERVICE

I, David M. Koller, hereby certify that on February 12, 2024, a true and correct

copy of Appellant's Brief and Appendix (Volume One) was filed electronically and was

served electronically upon the following Filing Users by the Court's Notice of Docket

Activity:

Kelly Diffily, Esq.
City of Philadelphia Law Department
Appeals Unit
1515 Arch Street, 17th Floor
Philadelphia, PA 19102-1595
Kelly.diffily@phila.gov
Appeals.unit@phila.gov
*Counsel for Appellee*

**KOLLER LAW, LLC**

Dated: February 12, 2024          By:     /s/ David M. Koller
                                          David M. Koller, Esquire (90119)
                                          Attorney for Appellant

# APPENDIX TABLE OF CONTENTS

## VOLUME ONE (Appended to Brief)

Notice of Appeal ............................................................................................Appx001

District Court Order .......................................................................................Appx003

District Court Memorandum Opinion............................................................Appx004

## VOLUME TWO

District Court Docket Entries.........................................................................Appx029

Complaint.......................................................................................................Appx035

Stipulation and Order to Amend Caption ......................................................Appx045

Answer to Complaint .....................................................................................Appx046

Statement of Material Facts in support of Motion for Summary Judgment.Appx059

    Deposition of Christopher Flacco.......................................................Appx087

    Deposition of Appellant......................................................................Appx189

    Exhibit 12 to Deposition of Appellant................................................Appx255

    Exhibit 13 to Deposition of Appellant................................................Appx260

    Exhibit 14 to Deposition of Appellant................................................Appx264

    Deposition of James Ferguson.............................................................Appx265

    Exhibit 2 to Deposition of James Ferguson........................................Appx300

    Exhibit 1 to Deposition of Jamill Taylor............................................Appx303

Appellant's Response to Appellee's Statement of Material Facts in support of Appellant's
Opposition to Summary Judgment ....................................................Appx304

    Deposition of Jamill Taylor.................................................................Appx371

Deposition of David Merrick...............................................................Appx421

Exhibit 1 to Deposition of James Ferguson.........................................Appx467

Exhibit 3 to Deposition of James Ferguson.........................................Appx468

Exhibit 4 to Deposition of James Ferguson.........................................Appx471

Muldoon v. City of Philadelphia, No. 22-1929, 2023 U.S. Dist. LEXIS 59711 (E.D. Pa. Apr. 5, 2023)......................................................................................Appx477

Schuck v. City of Philadelphia, No. 22-2124, 2023 U.S. Dist. LEXIS 82519 (E.D. Pa. May 11, 2023)....................................................................................Appx479

**KOLLER LAW, LLC**
David M. Koller, Esq. (90119)                                    *Counsel for Plaintiff*
Jordan D. Santo, Esq. (320573)
2043 Locust Street, Suite 1B
Philadelphia, PA 19103
(215) 545-8917 (phone)
(215) 575-0826 (fax)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN McCRorey,** | : | **Civil Action No.: 2:22-cv-02227** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that John McCrorey, Plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Third Circuit from the July 26, 2023, Order (Dkt. No. 48) entering summary judgment in favor of Defendant and against Plaintiff John McCrorey on his claims of age discrimination and retaliation under the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act.

                                             Respectfully Submitted,
                                             **KOLLER LAW, LLC**

                                             */s/ David M. Koller*
                                             David M. Koller, Esquire

Dated August 23, 2023

**KOLLER LAW, LLC**
David M. Koller, Esq. (90119)                                    *Counsel for Plaintiff*
Jordan D. Santo, Esq. (320573)
2043 Locust Street, Suite 1B
Philadelphia, PA 19103
(215) 545-8917 (phone)
(215) 575-0826 (fax)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN McCROREY,** | : | **Civil Action No.: 2:22-cv-02227** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on August 23, 2023, a true and correct copy of Plaintiff's Notice

of Appeal was served via the Court's electronic filing system upon the following:

> Gaetan J. Alfano, Esquire
> Christopher A. Iacono, Esquire
> Angela Lee Velez, Esquire
> 1818 Market Street, Suite 3402
> Philadelphia, PA 19103
> gja@pietragallo.com
> cai@pietragallo.com
> alv@pietragallo.com
> *Counsel for Defendant*

> KOLLER LAW, LLC

By:     **/s/ David M. Koller**
          DAVID M. KOLLER, Esq.
          Attorney for Plaintiff

Appx002

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| **JOHN MCCROREY,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 22-02227** |
| | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| *Defendant.* | : | |

## ORDER

**AND NOW**, this **2nd** day of **August 2023**, upon consideration of Defendant, City of Philadelphia's Memorandum of Law Requesting Redaction of the Court's Memorandum Decision Granting Summary Judgment (ECF No. 49), it is **hereby ORDERED** that the request is **GRANTED**.

The unredacted Memorandum granting Defendant's Motion for Summary Judgment (ECF No. 47) **shall remain under seal**. Accompanying this Order is a redacted version of the Memorandum for public viewing.

The Clerk shall **CLOSE** this case.

**BY THE COURT:**

**/s/ Chad F. Kenney**

_____

**CHAD F. KENNEY, JUDGE**

Appx003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **JOHN MCCROREY,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 22-02227** |
| | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| *Defendant.* | : | |

### MEMORANDUM

Kenney, J.                                                                    July 26, 2023

Plaintiff John McCrorey ("Plaintiff") brings this action against Defendant City of Philadelphia ("Defendant") alleging age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). Presently before this Court is Defendant's Motion for Summary Judgment (ECF No. 25), which has been fully briefed (ECF Nos. 30, 34). For the reasons set forth below, the Court will grant Defendant's Motion for Summary Judgment (ECF No. 25). An appropriate Order will follow.

## I.    FACTUAL BACKGROUND

Plaintiff John McCrorey was an officer of the Philadelphia Police Department from 1982 until his retirement in 2021. ECF No. 1 ¶¶ 21, 38, 53. In 2014, Plaintiff was assigned as a lieutenant and supervisor in the Narcotics Field Unit ("NFU"). *Id.* ¶¶ 27, 29; ECF No. 31 ¶ 27. Plaintiff remained in the NFU until his retirement in 2021. ECF No. 31 ¶¶ 101, 108, 116.

1

The NFU is a part of the Narcotics Division of the Narcotics Bureau, the branch of the Philadelphia Police Department responsible for enforcement of drug laws. *Id.* ¶¶ 9–10; ECF No. 1 ¶ 29. Specifically, the NFU is a "plainclothes, investigative unit of the Philadelphia Police Department that investigates drug crime or sales occurring indoors at properties with the goal of serving warrants for drugs and other contraband." ECF No. 31 ¶ 12. The NFU is divided into six squads covering six divisions across the City of Philadelphia: South, Southwest, Central, North, Northeast, and East Divisions. *Id.* ¶ 13. Plaintiff was assigned to the NFU squad covering the East Division ("East Squad"), which includes the neighborhood of Kensington, home to "the largest open-air drug market on the East Coast of the United States." *Id.* ¶¶ 14, 27. Prior to September 2020, NFU squads were generally comprised of one lieutenant, one sergeant, and multiple officers. *Id.* ¶ 16. Each lieutenant was supposed to report to Captain David Merrick. *Id.*

In July 2020, Christopher Flacco became the Chief Inspector of the Narcotics Bureau. *Id.* ¶ 1. Flacco testified that prior to his appointment, Deputy Commissioner Singleton, who informed Flacco of his appointment, told Flacco to "do what [he has] to do to fix [the Narcotics Bureau] and get it working." *Id.* ¶ 2. Since June 2019, the size of the Narcotics Bureau has declined due to attrition and retirements. *Id.* ¶ 23. The manpower for the NFU also decreased during this time, which, according to Flacco, forced the NFU to disband one of its two East Division squads. *Id.* ¶ 24; ECF No. 27 ¶ 2. Flacco also testified that, upon his appointment, Philadelphia City Council members voiced a desire for an improved narcotics enforcement strategy in Kensington, and that Flacco was thus directed to submit "a detailed plan of narcotics enforcement for the East Division" to the Philadelphia Police Commissioner's Office. ECF No. 31 ¶ 75.

Before his assignment to the Narcotics Bureau, Flacco served as the Chief Inspector of the Office of Professional Responsibility. *Id.* ¶ 3. Flacco testified that as a result of Internal Affairs

investigations conducted during his time in this role, he "was well aware of the lieutenants assigned to the Narcotics Bureau, their strengths, their weaknesses, the complaints that were put against them," and that he "had a pretty . . . good picture of the entire Narcotics Bureau and how it operated." *Id.* ¶¶ 4–5. Flacco testified further that with this background, he was "not impressed with the Narcotics Bureau as a whole," including its personnel, with only a few exceptions. *Id.* ¶ 6. According to Flacco, Plaintiff was not one of these exceptions, whereas Lieutenant Marques Newsome was. ECF No. 25-4 at 19.

Inspector Jamill Taylor, the supervisor of the Narcotics Division, testified that, upon arriving to the Bureau, Flacco evaluated the Bureau for a roughly two-month period to understand its operations. ECF No. 31 ¶¶ 10, 76. Following this period, Flacco proposed a plan, the Narcotics Enforcement Strategy ("NES"), on September 28, 2020. *Id.* ¶ 77. In the accompanying NES Memo, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ Additionally, an "enhanced NFU squad . . . would be created within the Narcotics Bureau to address the NES in [East Police Division ("EPD")]" with officers selected based on a number of criteria. ECF No. 27 ¶ 4.

At the time of Flacco's appointment to the NFU, Plaintiff was irrevocably scheduled to retire pursuant to the Deferred Retirement Option Program ("DROP") on October 23, 2021. ECF No. 31 ¶ 28. The DROP program is designed to assist the City with succession planning by

3

"[allowing] the city to know exactly when individuals are retiring, and which positions will need to be backfilled." *Id.* ¶ 133. To this end, the DROP program enables employees with City-issued pensions to commit to a retirement date four years in advance and collect both their salaries and pension payments during their final years in service. *Id.* ¶ 134. To be eligible for the DROP program, an officer must be eligible for retirement. *Id.* ¶ 135.

Plaintiff alleges that at a September 22, 2020 supervisor's meeting, Flacco "commented on how old the supervisors and personnel assigned to the unit [were]" and asked who was in the DROP program. ECF No. 1 ¶¶ 32, 36. Plaintiff alleges that this was not the first time that Flacco asked which members of the unit were DROP participants. ECF No. 34 ¶¶ 203–04. Plaintiff also alleges that, in reference to NFU personnel working protests in the city, Flacco stated, "we are out of the protest business" and "the police force [does not need] a bunch of fifty-year-old cops in uniform acting as an [Emergency Response Group]." ECF No. 1 ¶¶ 33–34. When asked who was in the DROP program, Plaintiff, along with Sergeant James Schuck and Lieutenant Robert Muldoon, raised his hand. *Id.* ¶ 37. Plaintiff alleges that Flacco then introduced his plan for an additional squad of three supervisors and twenty police officers to be formed in conjunction with the NES plan as the enhanced NFU squad in the East Division. *Id.* ¶ 39. At the same meeting, Flacco then selected Lieutenant Marques Newsome, Sergeant Vincent Nowakowski, and Sergeant Alonzo Jett, all in their forties, for the three supervisor positions, with the two sergeants reporting to Newsome. *Id.* ¶ 40; ECF No. 31 ¶¶ 103, 197.

As part of this reorganization, Flacco removed Plaintiff's entire squad, all over 50 years old, from the East Division, and reassigned Plaintiff, then 61 years old, to the Northwest Squad, still part of the NFU. ECF No. 1 ¶¶ 20, 31, 44; ECF No. 31 ¶¶ 101, 105. While Plaintiff's base salary did not change with this reassignment, Plaintiff contends that the East Squad had

4

significantly more opportunities for overtime than other squads "one, on the basis of the scope and area of the investigations, as well as the more people you're supervising, the more investigations are going to open, the more investigative overtime is going to be generated." ECF No. 31 ¶¶ 104, 106. Plaintiff also contends that "assignment to the revised East squad carried a certain amount of prestige and was perceived as favorable." ECF No. 30-1 at 7. Additionally, Plaintiff believes that the East Squad was "innovative, desirable, and esteemed," and that "supervising and being part of a new, advanced drug enforcement approach from the start up would give Plaintiff more visibility and boost his career." *Id.* at 5–6.

Plaintiff attributed his being moved off of the East Division to his age and DROP status, while Flacco testified that the decision was driven by a recognition of Lieutenant Newsome's qualifications for the position, not a desire to move Plaintiff off of the East Division. ECF No. 31 ¶¶ 89–90, 92–95, 107. Flacco also testified that Newsome was recommended for the position by Inspector Taylor. *Id.* ¶ 89. Comparing career advancement and pay opportunities in the East Squad to those of the Northwest Squad, Flacco testified that Plaintiff's reassignment was "to a different squad with the same exact responsibilities just in a different geographic part of the city," a characterization which Plaintiff disputes because of alleged differences in prestige and potential for overtime. *Id.* ¶¶ 102, 104; ECF No. 30-1 at 5–7. Plaintiff did not ask Flacco or Taylor if he could remain in the East Squad, nor did Plaintiff ask why he was reorganized to the Northwest Squad. ECF No. 31 ¶ 98.

Captain Merrick testified that he disagreed with Flacco's decision to appoint Newsome to the East Squad because Newsome lacked established relationships in the region. ECF No. 34 ¶ 181. Merrick also testified that Plaintiff previously ran the East Squad efficiently and was "overall [Merrick's] best lieutenant." *Id.* ¶ 180. Merrick testified further that Flacco's "reasoning [for the

5

reassignments] was basically he wanted to have particular lieutenants that were of a younger age in particular groups, and he kind of made the lieutenants that were older aware that they really weren't going to be included in his plans going forward." ECF No. 30-3 at 61.

Following Plaintiff's reassignment, Plaintiff went out on sick leave and began "running time," the practice of using accrued balances when nearing retirement, on September 23, 2020. ECF No. 31 ¶¶ 108–09. Plaintiff never reported to assume command of Northwest Squad and never returned to work. *Id.* ¶¶ 108, 116. Prior to going on leave, Plaintiff told Captain Merrick that he could not "deal with this guy upstairs and with everything [Plaintiff] has going on." *Id.* ¶ 115. Plaintiff also told Merrick that he was "going to get a doctor's note and [he] was going to start running time, and [he was] just going to go ahead on and retire." *Id.* At this time, Plaintiff's brother-in-law recently passed away and Plaintiff's son was in and out of the hospital and severely ill. *Id.* ¶¶ 113–14. During his time on leave, Plaintiff presented sick notes to the Police Department on October 5, 2020, December 2, 2020, January 15, 2021, February 15, 2021, and March 25, 2021. *Id.* ¶ 118. The first sick note alluded to "medical reasons," while the other four were attributed to "reported anxiety." ECF No. 25-4 at 176–80.

While on leave, on February 23, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant alleging age discrimination. ECF No. 1 ¶ 50. Flacco testified that he learned of Plaintiff's EEOC complaint when he was interviewed by the Employee Response Unit, some period after the initial complaint was filed. ECF No. 31 ¶ 132.

Also while on leave, on July 9, 2021, Plaintiff submitted a DROP extension election form. *Id.* ¶ 148. "The Philadelphia Code includes provisions which allow, under extraordinary circumstances, an extension in the DROP retirement program for up to one additional year." ECF

6

No. 25-4 at 226. Lieutenant James Ferguson, who served as administrative supervisor for Deputy Commissioner of Organizational Services Christine Coulter and was responsible for reviewing DROP extension applications, testified that extensions were approved to get "boots on the ground" due to staffing shortages. ECF No. 31 ¶¶ 137–38, 140. On July 2, 2021, the Mayor of Philadelphia authorized a one-time DROP extension for officers who were scheduled to retire on a DROP date falling within July 1, 2021 through June 30, 2022. *Id.* ¶ 142. The Mayor authorized this extension in response to crime levels, political unrest, the COVID-19 pandemic, and staffing needs. ECF No. 25-4 at 226.

Lieutenant Ferguson testified that in order to be eligible for the DROP extension, an employee had to be physically working or able to work. ECF No. 31 ¶ 147. The 2021-2022 DROP Extension FAQ document states that "sworn officers of the Police Department at the rank of Police Officer I or above who [were] required to separate from City employment between July 1, 2021 and June 30, 2022 as a result of their entry into the [DROP program] [were] eligible for this DROP extension." ECF No. 25-4 at 181. The FAQ also includes the question, "What happens if I am injured or become ill and need more time off?" *Id.* at 183. The answer states that "in order to serve the extraordinary circumstances that make this DROP extension necessary, it is essential that [the applicant] be able and available for work." *Id.* The answer states further, "If it is determined that [the applicant] [is] unable to perform the essential functions of the job, with or without reasonable accommodation, [the applicant's] participation in the DROP extension will end and [the applicant] will be separated from employment." *Id.*

The DROP extension election form submitted by Plaintiff on July 9, 2021, explains that the purpose of the DROP extension is to enhance the uniformed staffing strength due to existing levels of crime and as a result of large-scale events that are expected. ECF No. 31 ¶ 148. The form

further states that an individual must be able and available for work during the duration of the DROP extension period. *Id.* Although Plaintiff read the form before he signed it, and agreed to what was in it, at the time he signed it, he did not have a return to work date from any of his doctors. *Id.* ¶ 149.

Lieutenant Ferguson testified that the Deputy Commissioner had ultimate decision-making authority on DROP extensions "if there were questions regarding [an applicant's] status," and that decisions were made based on the totality of the circumstances. *Id.* ¶ 150. Ferguson was responsible for compiling information on DROP extension applicants and sending that information to the Deputy Commissioner. *Id.* ¶ 151. When Ferguson received the list of individuals who applied for the DROP extension, he would: first, ask the Police Department Safety Office their duty status and second, would personally run each name through the daily attendance reporting ("DAR") system. *Id.* ¶ 152. When Ferguson ran a DAR report for Plaintiff, the DAR system, which retained attendance information back roughly one and a half years, reflected that Plaintiff had been out on sick leave for the duration of the period run through the system. *Id.* ¶ 153.

On July 27, 2021, Plaintiff received a letter denying his DROP extension. *Id.* ¶ 156. The letter states that "extending employees must be able and available to work for the duration for he [sic] extended DROP period." ECF No. 25-4 at 190. The letter states further that "[t]he individual facts and circumstances of [Plaintiff's] work status [had] been reviewed and it [had] been determined that [he was] not currently able or available to work. As such, [he was] not eligible for the DROP extension authorized by Mayor Kenney." *Id.*

Despite being out on leave for months and receiving this letter, Plaintiff believes that he was denied a DROP extension because he claims he received a phone call from an unidentified individual saying that Flacco was going to try and deny his and Lieutenant Muldoon's DROP

extensions. ECF No. 31 ¶ 157. The caller was neither Flacco nor Taylor. *Id.* Notably, Lieutenant Muldoon's DROP extension was approved and he remained working in the NFU. *Id.* ¶ 158. In total, four individuals were denied DROP extensions during this period, two, including Plaintiff, were out on extended sick leave, and the other two were "out injured on duty." *Id.* ¶ 160. Ferguson testified that no officers that were out on extended sick, vacation, or injury leave were granted a DROP extension in fiscal year 2022. ECF No. 25-4 at 204. Ferguson also testified that he was not aware of Plaintiff's EEOC complaint at the time of the DROP extension denial. ECF No. 31 ¶ 162. Flacco testified that he had no part in the DROP extension denial as "[i]t has nothing to do with the bureau chiefs or the chain of command of the individual officer," and that he was not even aware of Plaintiff's DROP extension request. *Id.* ¶ 163. None of the individuals involved with the DROP extension decision reported to Flacco or fell within the groups that had access to EEOC complaints. *Id.* ¶ 164.

Pursuant to his original DROP date, Plaintiff retired on October 23, 2021. *Id.* ¶ 165.

## II. **PROCEDURAL HISTORY**

On June 6, 2022, Plaintiff filed this Complaint against the City of Philadelphia alleging age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). ECF No. 1. On March 29, 2023, Defendant moved for summary judgment on the grounds that Plaintiff's age discrimination and retaliation claims both fail as a matter of law. ECF No. 25-2 at 2. Plaintiff filed a Response in Opposition on April 19, 2023 (ECF No. 30), and Defendant filed a Reply on April 26, 2023 (ECF No. 34). The Court held oral argument on May 16, 2023. ECF No. 36.

III.     **STANDARD OF REVIEW**

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Indeed, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *see also* Fed. R. Civ. P. 56(c).

The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. The non-movant opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d

10

965, 969 (3d Cir. 1982). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

When determining the existence of a genuine issue of material fact, a court must "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court need only decide whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

## IV. **DISCUSSION**

Defendant argues that they are entitled to summary judgment on Plaintiff's age discrimination claim because (1) Plaintiff cannot establish a *prima facie* case of age discrimination; and (2) Defendant had legitimate, nondiscriminatory reasons for the East Squad supervisor decision. Defendant also argues for summary judgment on Plaintiff's retaliation claim because (1) Plaintiff cannot prove a *prima facie* case of retaliation under the ADEA or the PHRA; (2) Plaintiff cannot establish a pattern of antagonism because he never returned to work; and (3) Defendant had legitimate, non-retaliatory reasons for deeming Plaintiff ineligible for a DROP extension.

11

In response, Plaintiff argues that (1) summary judgment on the age discrimination claim should be denied because Defendant's explanation for its actions were pretext for its discrimination in violation of the ADEA and PHRA; and (2) summary judgment on the retaliation claim should be denied because Plaintiff engaged in protected conduct under the ADEA and PHRA, and his DROP extension denial in conjunction with discriminatory treatment establish causation.

As set forth below, the Court finds that (1) Plaintiff's age discrimination claim fails because Plaintiff fails to establish a genuine issue of material fact that his transfer constituted an adverse employment action; and (2) Plaintiff's retaliation claim fails because Plaintiff fails to establish a genuine issue of material fact that his DROP extension denial constituted an adverse employment action, and that his EEOC complaint caused the DROP extension denial. Accordingly, Defendant is entitled to summary judgment.

A.    <u>Age Discrimination Claim</u>

The ADEA makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1).

In their Motion for Summary Judgment, Defendant contends, *inter alia*, that there is no direct evidence of age-based discrimination and, accordingly, Plaintiff's claims should be evaluated under the three-step burden shifting inquiry from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–03 (1973). ECF No. 25-2 at 8. As there is no evidence that would prove age discrimination "without inference or presumption," the Court agrees that the burden shifting inquiry is the appropriate test. *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (citations omitted).

Appx015

"The *McDonnell Douglas* framework requires that the plaintiff first establish a *prima facie* case of discrimination or retaliation. If the plaintiff successfully meets the requirements of a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its actions. If the employer produces such a reason, the burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–04).

"The existence of a *prima facie* case of employment discrimination is a question of law that must be decided by the Court." *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003). First, to establish a *prima facie* case of age discrimination under either the ADEA or PHRA, Plaintiff must establish that he: (1) is forty years of age or older; (2) was subject to an adverse employment action; (3) was qualified for the position in question; and (4) was replaced by another employee who was sufficiently younger to support an inference of discrimination. *Torre*, 42 F.3d at 830. "Where the plaintiff is not directly replaced, the fourth element is satisfied if the plaintiff can provide facts which 'if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999)).

There is no dispute that Plaintiff satisfies the first and third prongs of a *prima facie* case of age discrimination—Plaintiff is over forty years of age and was qualified to be a lieutenant in the NFU's East Squad. *Torre*, 42 F.3d at 830; ECF No. 25-2 at 9. However, as set forth below, Plaintiff fails to establish a genuine issue of material fact as to the second prong—*i.e.*, that he suffered an adverse employment action. *Torre*, 42 F.3d at 830. Because Plaintiff was not subject to an adverse

13

employment action, the Court will not address the fourth element of the *prima facie* age discrimination case, whether the circumstances of Plaintiff's transfer support an inference of discrimination. *Id*. Additionally, because Plaintiff fails to establish a *prima facie* case of age discrimination, the Court will not address further burden shifting under the *McDonnell Douglas* framework. *Tourtellotte*, 636 F. App'x at 842.

An "adverse employment action" has been defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 518 (E.D. Pa. 2012). Outside of employment actions with direct and immediate economic consequences, employment actions that impede professional growth or significantly disrupt working conditions may also be adverse. *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999); *Walker v. Centocor Ortho Biotech, Inc.*, 558 Fed. App'x 216, 219 (3d Cir. 2014).

"Employment actions such as lateral transfers and changes of title or reporting relationships have generally been held not to constitute adverse employment actions." *Walker*, 558 Fed. App'x at 219 (citing *Burlington Indus.*, 524 U.S. at 761). For lateral transfers to qualify as adverse employment actions, the transfer must generally lead to a change in "pay, benefits, duties, prestige," or rank. *Id.*; *see also Rosati v. Colello*, 94 F. Supp. 3d 704, 714 (E.D. Pa. 2015) (finding no adverse employment action where officer was reassigned to different platoon in same district with same schedule and accommodations). As noted in *Burlington*, inconveniences and "bruised ego[s]" have been deemed insufficient to categorize transfers as adverse employment actions. *Burlington Indus.*, 524 U.S. at 761. An employee's subjective preference for one position does not, absent additional facts, make the employee's assignment to another position an adverse

14

employment action. *Swain v. City of Vineland*, 457 Fed. App'x 107, 110–11 (3d Cir. 2012). Rather, there must be some indication that the preferred position's responsibilities are "objectively better (*e.g.*, more prestigious or less burdensome)," than those of the less preferred position. *Id.* (holding that employee's preference for K-9 unit, which he considered a "specialized endeavor," absent material difference in compensation, terms, conditions, privileges, prestige, or responsibilities, was not sufficient to create adverse employment action when officer was not assigned to that unit). Additionally, "a speculative increase in potential overtime does not qualify as a change in the terms or conditions of employment, particularly where one's current position . . . offers its own opportunities to earn overtime." *Id.* at 111.

The Third Circuit has not provided specific guidance on analyzing differences in prestige, however courts in other jurisdictions have looked for objective factors to substantiate the notoriously subjective measure of "standing or estimation in the eyes of people." *Freeman v. Potter*, 200 Fed. App'x 439, 444–45 (6th Cir. 2006) (citation omitted). Factors examined have included a role's associated level of responsibility, unique characteristics, and training or educational requirements. *Id.* (citing *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004)). Tangible effects on career advancement have also been analyzed. *See Bryson v. Chicago State University*, 96 F.3d 912, 916 (7th Cir. 1996) (finding that title stripped from professor "conferred prestige and was important to further professional advancement" as it communicated professor's qualifications to other academics). Additionally, courts have looked for some showing that the employee's target position was *more* prestigious than the employee's less-preferred position. *See Freeman*, 200 Fed. App'x at 445 (holding that conclusory evidence regarding differences in relative prestige between positions was insufficient to support contention of prestige-based adverse employment action). Prestige has also been distinguished from

15

desirability, which alone may or may not be sufficient to create an actionable claim of adverse employment action. *Compare id.* (holding that although preferred position may have been more desirable because located in university town with "ready access to collegiate athletic events, arts, community lectures, etc., . . . simply because a position is desirable to someone does not make the failure to get it actionable"), *with Torre*, 42 F.3d 825 at 831 n. 7 (finding plaintiff "created a material fact issue concerning whether he was transferred . . . to a dead-end job that had effectively been eliminated before he was transferred to it," even though no difference in pay or benefits), *and Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 115 (3d Cir. 1996) (finding officer's claim that road patrol assignment was less desirable than detective bureau was sufficient to overcome summary judgment even without cut in pay or rank).

In the present case, Plaintiff's reassignment from the East Squad to the Northwest Squad resulted in no direct, immediate economic harm as Plaintiff remained a lieutenant in the NFU and retained the same base compensation. ECF No. 31 ¶¶ 102, 104. Plaintiff contends that his responsibilities would have changed with his reassignment to the Northwest Squad, but provides no evidence demonstrating how his duties would have actually differed. *Id.* ¶ 86. Rather, Plaintiff bases his theory of adverse employment action on two separate contentions: (1) that the Northwest Squad offered "significantly" less opportunities for earning overtime than the East Squad; and (2) that the Northwest Squad was perceived as less prestigious than the East Squad and offered less opportunities for visibility that could "boost [Plaintiff's] career." ECF No. 31 ¶ 106; ECF No. 30-1 at 5–7. For the reasons set forth below, the Court finds both arguments are insufficient to establish an adverse employment action.

For Plaintiff's overtime contention, Plaintiff argues that the East Squad offered more opportunities for overtime "on the basis of the scope and area of the investigations" and because

16

"the more people you're supervising, the more investigations are going to open, the more investigative overtime is going to be generated." ECF No. 31 ¶¶ 104, 106. This contention fails to rise beyond speculation. *See Swain*, 457 Fed. App'x at 111. As in *Swain*, Plaintiff asserts that there would be a discrepancy in overtime between the two positions but provides only vague assumptions to support his assertion. *Id.*; ECF No. 31 ¶¶ 104, 106. The Northwest Squad was not without opportunities for overtime, and Plaintiff fails to present facts establishing that the overtime opportunities in the Northwest Squad were inferior to those of the East Squad. ECF No. 31 ¶¶ 104, 106.

Plaintiff's prestige contention is similarly unpersuasive. Although Flacco's NES Memo indicates that consideration for the revamped East Squad did require certain qualifications, Plaintiff provided no evidence demonstrating that the position entailed unique responsibilities or characteristics that could have a bearing on career advancement. ECF No. 27 ¶ 4; ECF No. 30-1 at 5–7. Plaintiff's belief that the revamped East Squad was "innovative, desirable, and esteemed" is remarkably similar to the officer's belief in *Swain* that the K-9 unit was a "specialized endeavor." *See Swain*, 457 Fed. App'x at 110–11; ECF No. 30-1 at 5–7. In this case, as in *Swain*, the preferred position confers no advantage in compensation, terms, conditions, privileges, or responsibilities. *See Swain*, 457 Fed. App'x at 110–11; ECF No. 30-1 at 5–7. Additionally, prestige is generally evaluated through the lens of career advancement, but Plaintiff was already enrolled in the DROP program and scheduled to retire in 2021. *See Bryson*, 96 F.3d at 916; ECF No. 31 ¶ 28. Thus, even if supervising the revamped East Squad would have signified to others in the Police Department that Plaintiff was doing a certain kind of "innovative" police work, the assignment still would have no bearing on Plaintiff's career advancement since his retirement was imminent. *See Bryson*, 96 F.3d at 916; ECF No. 31 ¶ 28. Plaintiff also offers no characterization of the Northwest Squad's

17

prestige relative to that of the East Squad. *See Freeman*, 200 Fed. App'x at 445; ECF No. 30-1 at 5–7.

Ultimately, Plaintiff's theory of adverse employment action comes down not to prestige, but desirability. *See Freeman*, 200 Fed. App'x at 445; *but see Torre*, 42 F.3d 825 at 831 n.7, *and Hampton*, 98 F.3d at 115. Plaintiff, a veteran officer approaching retirement, wished to stay in the East Division with "[his] guys." ECF No. 31 ¶ 107. While Plaintiff's distress at his unexpected transfer so close to retirement is understandable, the Court finds no tangible impact of the transfer beyond loss of desirability. *See Freeman*, 200 Fed. App'x at 445; ECF No. 31 ¶ 107.

*Muldoon v. City of Philadelphia* and *Schuck v. City of Philadelphia*, the sister cases to this case initiated by Lieutenant Robert Muldoon and Sergeant James Schuck, respectively, denied defense motions for summary judgment finding sufficient evidence of adverse employment action by relying on the holdings in *Torre* and *Hampton* concerning desirability. *Muldoon v. City of Philadelphia*, No. 22-1929, 2023 WL 2789692, at *1 (E.D. Pa. Apr. 5, 2023); *Schuck v. City of Philadelphia*, No. 2:22-cv-02124, 2023 WL 3393416, at *2 n.3 (E.D. Pa. May 11, 2023). The Court finds these cases distinguishable. In *Torre*, the plaintiff was terminated after being transferred to what he viewed as a "dead-end job" that allowed for his termination to come at a "more propitious—and seemingly innocent—moment." *Torre*, 42 F.3d at 827–28. Here, Plaintiff was not terminated and his transfer was from one of the NFU's six geographic regions to another, far from a "dead-end job" but rather integral to the operations of the NFU as a whole. *See id.* In *Hampton*, the plaintiff was transferred from the detective bureau to a substantively different role in road patrol which he viewed as less desirable. *Hampton*, 98 F.3d at 111, 116. Here, Plaintiff was transferred to a role in the same division with the same general duties, greatly distinguishable from a move from detective work to road patrol. *See id.* Additionally, if the plaintiff in *Hampton*

18

viewed the road patrol assignment as less desirable *because* it was less prestigious, then this would be a prestige-based argument which Plaintiff fails to establish. *See id.* For these reasons, the Court finds any loss in desirability as a result of Plaintiff's transfer insufficient to classify the transfer as an adverse employment action.

Accordingly, even taking the facts and inferences in the light most favorable to Plaintiff as the non-moving party, Plaintiff has failed to meet his burden to show a *prima facie* case of age discrimination.

B.    Retaliation Claim

Plaintiff also brings claims of retaliation pursuant to the ADEA and PHRA. Once again, since there is no direct evidence of retaliation, the Court uses the burden shifting framework in *McDonnell Douglas*. "[A] plaintiff asserting a retaliation claim first must establish a *prima facie* case by showing (1) [that he engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) (internal citations omitted). There is no dispute that Plaintiff's EEOC Complaint, filed February 23, 2021, constituted protected employee activity. However, for the reasons set forth below, Plaintiff fails to establish a genuine issue of material fact either that (1) he was subject to an adverse employment action contemporaneous with or following his EEOC complaint; or (2) his EEOC complaint caused the adverse employment action, if found. Again, because Plaintiff fails to establish a *prima facie* case of retaliation, the Court will not address further burden shifting under the *McDonnell Douglas* framework. *Tourtellotte*, 636 F. App'x at 842.

19

### 1.    Adverse Employment Action

To determine whether an employee was subject to an adverse employment action in response to or during the protected activity, the Court "examine[s] the challenged conduct from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Daniels*, 776 F.3d at 195 (internal citations and quotation marks omitted). "[P]laintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* The spectrum of employer actions that may be categorized as adverse is also broader in retaliation claims than discrimination claims. *See Komis v. Sec'y of U.S. Dep't of Lab.*, 918 F.3d 289, 293 (3d Cir. 2019) (stating that "[u]nlike the antidiscrimination provision, the antiretaliation provision is not limited to employer action that affects the terms and conditions of a claimant's employment").

Here, while not dispositive, the denial of Plaintiff's DROP extension application did not seriously alter Plaintiff's compensation, terms, conditions, or privileges of employment. *Id.* If Plaintiff sincerely believed that he was entitled to the DROP extension as a privilege of his employment, that belief was not reasonable. *Daniels*, 776 F.3d at 195. Plaintiff harbored no illusions as to the function of the DROP program, testifying, "[Y]ou sign a contract with the City saying that on that date you have to retire." ECF No. 31 ¶ 38. Far from guaranteed, DROP extensions are allowed under the Philadelphia Code only for "extraordinary circumstances." ECF No. 25-4 at 226. The Mayor declared such an extraordinary circumstance authorizing DROP extensions on July 2, 2021, "as a result of the level of shootings, political unrest, and economic circumstances faced by the City as it [recovered] from the COVID-19 pandemic, and existing and projected staffing levels within the key departments in the City, that threatens public health, safety, and welfare." *Id.* Even when DROP extensions are formally authorized, individual approval is

20

clearly limited based on ability to work. *Id.* at 183, 186. The DROP Extension FAQ makes clear that "it is essential that [the applicant] be able and available for work." *Id.* at 183. Plaintiff's DROP Extension Election Form states, "I affirm that I am currently able to perform the essential functions of my position . . . I also understand that . . . I must be able and available for work for the duration of the extended DROP period." *Id.* at 186.

Plaintiff contends that the Election Form only conveys that applicants must be available to work during the extended period, not also during the period leading up to the original DROP date. ECF No. 30-1 at 16. This is a mischaracterization of the document. *Id.* Plaintiff affirmed that he was currently able to work, but never returned to work or provided a doctor's note indicating that he could return. ECF No. 31 ¶¶ 148–49. In a police force combating attrition and personnel shortages, the DROP program, and by extension, the DROP extension program, exist to facilitate personnel planning and keep "boots on the ground." *Id.* ¶¶ 23, 133, 140. Granting a DROP extension to an officer who is out sick and running time with no timetable for return would contravene this purpose. *Id.* Accordingly, the only four DROP extensions denied during this period were for individuals that were out on extended leave. *Id.* ¶ 160.

Taking all facts in the light most favorable to Plaintiff, Plaintiff still fails to establish that a reasonable employee would have found the DROP extension denial materially adverse. *Daniels*, 776 F.3d at 195. Plaintiff was not entitled to a DROP extension merely on account of his enrollment in the DROP program, and indeed he was not qualified for the extension given his prolonged absence from work. *Id.* A reasonable employee would not be dissuaded from engaging in protected conduct for fear of being denied something they had no chance of being granted in the first place, and as such the Court finds no evidence that Plaintiff was subject to an adverse employment action in response to his EEOC complaint. *Id.*

## 2. Causal Connection Between Protected Act and Adverse Action

Even if the DROP extension denial constituted an adverse employment action, Plaintiff fails to raise a genuine issue of material fact that his EEOC complaint caused the denial. To prove causation in this context, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Burton v. Pennsylvania State Police*, 990 F. Supp. 2d 478, 509 (M.D. Pa. 2014) (citing *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)), *aff'd*, 612 F. App'x 124 (3d Cir. 2015). Courts "consider 'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment." *Daniels*, 776 F.3d at 196 (internal citations omitted). "To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if 'unusually suggestive.'" *Id.* (internal citations omitted). "In the absence of such a close temporal proximity, [courts] consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Id.* (internal citations omitted). Intervening antagonism by an employer may create an inference of causation where the plaintiff offers "circumstantial evidence of a 'pattern of antagonism' following the protected conduct." *Bailey v. Commerce Nat. Ins. Servs., Inc.*, 267 F. App'x 167, 170 (3d Cir. 2008) (citing *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)). "The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels*, 776 F.3d at 196–97 (internal citations omitted).

Here, roughly five months[1] passed between Plaintiff's EEOC complaint, filed February 23, 2021, and Plaintiff's receipt of the DROP extension denial letter, dated July 27, 2021. ECF No. 1 ¶ 50; ECF No. 31 ¶ 156. In *Williams v. Philadelphia Housing Authority Police Dept.*, the Third Circuit found that an elapsed period of two months between a protected activity and adverse employment action was "not so close as to be unduly suggestive." 380 F.3d 751, 760 (3d Cir. 2004) (citations omitted). Similarly, in *LeBoon v. Lancaster Jewish Community Center Ass'n*, the Third Circuit found that "[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." 503 F.3d 217, 233 (3d Cir. 2007) (citations omitted). In *Bailey*, the Third Circuit similarly found that an elapsed period of four months was not unduly suggestive. 267 F. App'x at 170 (citations omitted). With these decisions in mind, the Court finds that the elapsed five month period is not unduly suggestive of retaliatory motive.

Plaintiff also offers insufficient evidence to establish that he experienced a pattern of antagonism. In *Robinson v. Southeastern Pennsylvania Transp. Authority, Red Arrow Div.*, the Third Circuit found a pattern of antagonism where the employer "subjected [plaintiff] to a constant barrage of written and verbal warnings . . ., inaccurate [disciplinary] point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial [protected conduct] and continued until his discharge" 982 F.2d 892, 895–96 (3d Cir. 1993) (internal quotation marks

---

[1]     Defendant's Motion for Summary Judgment cited ten months between the protected activity and DROP extension denial. ECF No. 25-2 at 20. Rather than use Plaintiff's EEOC complaint as the protected conduct, this calculation appears to use the date Plaintiff went on leave, September 23, 2020. ECF No. 31 ¶ 108–09, 156. As Plaintiff only alleges retaliation in response to the EEOC complaint, the Court will use the date the EEOC complaint was filed, February 23, 2021.

omitted). Given this pattern, "the court could reasonably find that the initial series of events [surrounding the protected conduct] thus caused [plaintiff's] and [defendant's] relationship to deteriorate." *Id.* Here, there is no such pattern as Plaintiff was permitted to continue running time up to his DROP date without ever being subjected to any kind of disciplinary action or other form of antagonism. ECF No. 31 ¶¶ 108–109, 116. A single call from an unidentified individual stating that Flacco would try to deny Plaintiff's and Muldoon's DROP extensions is at most an isolated occurrence that fails to establish a pattern indicative of retaliatory cause. *Id.* ¶¶ 157–58.

Perhaps most importantly, Plaintiff fails to establish that any of the decisionmakers behind the DROP extension denial were aware of Plaintiff's EEOC complaint at the time of the decision, a showing that *Daniels* instructs is essential to establishing causation. *Daniels*, 776 F.3d at 196–97. None of the individuals involved with the DROP extension decision reported to Flacco or fell within the groups that had access to EEOC complaints. ECF No. 31 ¶ 164. Even if Flacco was aware of Plaintiff's EEOC complaint prior to the DROP extension decision, Lieutenant Ferguson, who was responsible for reviewing the extension applications, testified that he was not aware of the complaint, and nothing in the record indicates otherwise. *Id.* ¶ 162. Plaintiff also provides no evidence that Christine Coulter, Deputy Commissioner of Organizational Services, was aware of the complaint. *Id.* ¶ 137. Additionally, the phone call from an unidentified individual fails to rise beyond hearsay. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (noting that "hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment") (internal citation omitted).

For these reasons, even taking the facts and inferences in the light most favorable to Plaintiff as the non-moving party, Plaintiff has failed to establish that his EEOC complaint was the "but-for cause" of the DROP extension denial. *Burton*, 990 F. Supp. 2d at 509. Far from

establishing the protected conduct as a but-for cause of the denial, Plaintiff has not even established that the protected conduct was a contributing cause. *Id.* Plaintiff was out on leave with no timetable for return and denied the ability to extend his participation in a program designed to facilitate personnel planning and keep "boots on the ground." ECF No. 31 ¶¶ 23, 133, 140. Four officers were denied DROP extensions, and all four were out on extended leave. *Id.* ¶ 160. Conversely, Lieutenant Muldoon, who also filed an EEOC complaint but, unlike Plaintiff, remained at work, was granted a DROP extension. *Id.* ¶ 158; *Muldoon*, 2023 WL 2789692, at *1. As such, Plaintiff's prolonged absence from work is the only apparent cause of his DROP extension denial, and Plaintiff has not provided sufficient evidence to establish even a tenuous causal link tracking the decision back to his EEOC complaint.

## V.     **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 25) is granted, and judgment is entered in favor of Defendant. An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**
_____
**CHAD F. KENNEY, JUDGE**

Appx028