**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

No. 23-2539

**JOHN MCCROREY,**

Plaintiff/Appellant,

V.

**CITY OF PHILADELPHIA,**

Defendant/Appellee.

**BRIEF OF APPELLEE THE CITY OF PHILADELPHIA**

Appeal from the July 26, 2023 Order granting summary judgment in favor of Defendant and against Plaintiff, issued by the United States District Court for the Eastern District of Pennsylvania, the Honorable Chad F. Kenney, No. 22-cv-02227

CITY OF PHILADELPHIA
LAW DEPARTMENT
RENEE GARCIA, CITY SOLICITOR

By: Kelly Diffily, Esq.
Pa. I.D. No. 200531
Senior Attorney, Appeals Unit
1515 Arch Street, 17th Floor
Philadelphia, PA 19102-1595
(215) 683-5010 / kelly.diffily@phila.gov
*Counsel for Appellee the City of Philadelphia*

Date: May 10, 2024

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ..................................................................... i

**TABLE OF AUTHORITIES** ........................................................... iii

**Page(s)** .................................................... **Error! Bookmark not defined.**

**COUNTERSTATEMENT OF JURISDICTION** ................................................. 1

**COUNTERSTATEMENT OF THE QUESTIONS  PRESENTED ON APPEAL** ......................................................................................... 2

**COUNTERSTATEMENT OF THE STANDARD OF REVIEW** ...................... 3

**COUNTERSTATEMENT OF THE CASE AND OF THE FACTS** .................. 4

    **I.**    **Statement of the Facts** ........................................................ 4

        A.    1982: Lt. McCrorey joins the Philadelphia Police Department. .................................................................... 4

        B.    2013 to 2020: Lieutenant McCrorey works in the Police Department's Narcotics Field Unit, supervising East Squad. ... 4

        C.    Around 2017: Lt. McCrorey enrolls in the DROP program, committing to retiring by October 23, 2021. ............................ 5

        D.    July 2020: Chief Flacco is appointed as Chief Inspector of the Narcotics Bureau. ....................................................... 6

        E.    August and September 2020: Chief Flacco evaluates the Narcotics Bureau. ........................................................ 7

        F.    September 22, 2020: Chief Flacco announces his intent to move certain NFU supervisors to different geographic squads within the Unit, including Lt. McCrorey. .................... 10

            September 23, 2020: The next day, Lt. McCrorey goes out on permanent sick leave. ......................................................... 11

        H.    February 2021: Lt. McCrorey files a Charge of Discrimination with the EEOC. ............................................... 11

        I.    July 2021: Lt. McCrorey applies for and is denied a one-year DROP extension. ...................................................... 11

        J.    October 23, 2021: McCrorey retires having never reported for work to lead Northwest Squad. .......................................... 13

    **II.**    **Statement of the Case** ....................................................... 13

**SUMMARY OF ARGUMENT** .......................................................................**15**

**ARGUMENT** .........................................................................................**17**

    **I.**    **The District Court properly rejected Lt. McCrorey's claim for alleged age discrimination under the ADEA and PHRA. ...... 17**

        A.    The McDonnell Douglas framework. ...................................... 17

        B.    The District Court properly determined Lt. McCrorey did not make out a *prima facie* claim of age discrimination. ........ 19

            1.    The Supreme Court's April 2024 decision in Muldrow. .................................................................. 20

            2.    There is insufficient record evidence to create a fact question as to whether reassigning Lt. McCrorey to Northwest Squad caused any harm. ......... 22

        C.    Alternatively, Lt. McCrorey failed to offer sufficient evidence of pretext to survive summary judgment. ................. 29

            1.    Chief Flacco had legitimate managerial reasons for putting Lt. Newsome in charge of East Squad and moving Lt. McCrorey to Northwest Squad. ................. 30

            2.    Lt. McCrorey offered insufficient evidence of pretext. .......................................................................... 32

    **II.**    **The District Court correctly granted summary judgment on Lt. McCrorey's retaliation claim. .................................................... 38**

        A.    The District Court properly determined that Lt. McCrorey did not demonstrate materially adverse action. ....................... 40

        B.    The District Court correctly held Lt. McCrorey produced insufficient evidence of causation. .......................................... 42

        C.    Alternatively, McCrorey produced no evidence suggesting the Department's reason for denying his DROP extension application was pretextual. ...................................................... 44

**CONCLUSION** .....................................................................................**49**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Beers-Capitol v. Whetzel,
    256 F.3d 120 (3d Cir. 2001)........................................................................... 3, 10

Bianchi v. B & G Mach., Inc.,
    2023 WL 1879468 (3d Cir. Feb. 10,2023) ..........................................................34

Big Apple BMW, Inc. v. BMW of N. Am., Inc.,
    974 F.2d 1358 (3d Cir. 1992)..................................................................................28

Brewer v. Quaker State Oil Ref. Corp.,
    72 F.3d 326 (3d Cir. 1995)......................................................................................30

Bryan v. Gov't of Virgin Islands,
    916 F.3d 242 (3d Cir. 2019)...................................................................................36

Burlington Northern & Santa Fe Ry. Co. v. White ,
    548 U.S. 53 (2006).................................................................................................40

Daniels v. School Dist. of Phila.,
    776 F.3d 181 (3d Cir. 2015)............................................................. 39, 40, 42, 43

Ezold v. Wolf, Block, Schorr & Solis-Cohen,
    983 F.2d 509 (3d Cir. 1992)....................................................................................30

Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69 (3d Cir. 1996) ........... 20, 27

Freeman v. Potter,
    200 Fed.Appx. 439 (6th Cir. 2006)........................................................................27

Fuentes v. Perskie,
    32 F.3d 759 (3d Cir. 1994)...................................................................... 33, 38, 45

Glanzman v. Metro. Mgmt. Corp.,
    391 F.3d 506 (3d Cir. 2004).................................................................... 34, 37, 38

Gray v. York Newspapers, Inc.,
    957 F.2d 1070 (3d Cir.1992).................................................................................30

Gross v. FBL Fin. Servs., Inc.,
   557 U.S. 167 (2009) ...................................................................... 18, 37

Halsey, v. Pfeiffer, 750 F.3d 273 (3d Cir. 2014) ............................................ 20, 26

Hazen Paper Co. v. Biggins,
   507 U.S. 604 (1993) .............................................................. 18, 36, 37

Hughes v. Long,
   242 F.3d 121 (3d Cir. 2001) ................................................................29

Jones v. Sch. Dist. of Philadelphia,
   198 F.3d 403 (3d Cir. 1999) ................................................................27

Kelly v. Moser, Patterson and Sheridan, LLP,
   348 Fed.Appx. 746 (3d Cir. 2009) ................................................. 36, 37

Kentucky Retirement Systems v. EEOC,
   554 U.S. 135 (2008) ...........................................................................36

Larochelle v. Wilmac Corp.,
   769 Fed.Appx. 57 (3d Cir. 2019) .........................................................23

LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,
   503 F.3d 217 (3d Cir. 2007) ................................................................42

Martinez v. UPMC Susquehanna,
   986 F.3d 261 (3d Cir. 2021) ................................................................18

MBIA Ins. Corp. v. Royal Indem. Co.,
   426 F.3d 204 (3d Cir. 2005) ..................................................................3

McDonnell Douglas Corp. v. Green,
   411 U.S. 792 (1973) ................................................... 17, 18, 38, 39

Muldrow v. City of St. Louis, Missouri,
   22-193, 601 U.S. --, 144 S.Ct. 967, 2024 WL 1642826 (U.S. Apr. 17, 2024)
   .................................................................................................. passim

Muldrow v. City of St. Louis, Missouri,
   22-193, 601 U.S. --, 144 S.Ct. 967, 2024 WL 1642826 (U.S. Apr. 17, 2024)....23

iv

Palmer v. Britton Indus., Inc.,
662 Fed.Appx. 147 (3d Cir. 2016) ................................................... 33, 37

Price Waterhouse v. Hopkins,
490 U.S. 228 (1989) ...........................................................................38

Sabinsa Corp. v. Creative Compounds, LLC,
609 F.3d 175 (3d Cir. 2010) ...............................................................20

Salkovitz v. Pioneer Elecs. (USA) Inc.,
188 Fed.Appx. 90 (3d Cir. 2006) ........................................................36

Smith v. City of Allentown,
589 F.3d 684 (3d Cir. 2009) ....................................................... 18, 43

Sterner v. Siemens Med. Sols. USA, Inc.,
706 Fed.Appx. 772 (3d Cir. 2017) ......................................................35

Stewart v. Union Cnty. Bd. of Educ.,
655 Fed.Appx. 151 (3d Cir. 2016) ......................................................44

Swain v. City of Vineland,
457 Fed.Appx. 107 (3d Cir. 2012) ............................................. 14, 26

Tomasso v. Boeing Co.,
445 F.3d 702 (3d Cir. 2006) ....................................................... 33, 45, 47

Vasbinder v. Sec'y Dep't of Veterans Affairs,
487 Fed.Appx. 746 (3d Cir. 2012) ......................................................34

Williams v. Guard Bryant Fields,
535 Fed.Appx. 205 (3d Cir. 2013) ......................................................44

Williams v. Phila. Hous. Autho. Police Dep't,
380 F.3d 751 (3d Cir. 2004) ...............................................................42

**Statutes**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et. seq.* ............17

29 U.S.C. § 623(a)(1) .................................................................. 18, 23

29 U.S.C. § 623(d) .............................................................................39

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq.* .................20

42 U.S.C. § 2000e-2(a)(1) ........................................................... 21, 23

Pennsylvania HumanRelations Act, Act of October 27, 1955, P.L. 744, as amended, *43 P.S.* §§ 951-963 ........................................................17

43 P.S. § 955 ............................................................... 18, 23, 39

Phila. Code § 22-310(2) ...................................................................40

## COUNTERSTATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF THE QUESTIONS
## PRESENTED ON APPEAL

1.      Did the District Court properly grant summary judgment against a former police lieutenant on his age discrimination claim, which challenged his boss' decision to internally reassign him to do the same job supervising narcotics investigations in the same plain clothes unit, just overseeing a different squad of officers, where the lieutenant proffered insufficient evidence to support a competent inference that the reassignment left him worse off or that the supervisor's legitimate reasons for exercising his managerial prerogative were pretextual?

(Answered below: Yes.) (Suggested answer: Yes.)


2.      Did the District Court correctly grant summary judgment on the former lieutenant's retaliation claim that the police department denied his request to extend his retirement date in retaliation for having filed an EEOC complaint against his boss, where he was ineligible for an extension, where the decisionmakers had no knowledge of the complaint and where he offered no evidence that the department's reason for the denial was pretextual?

(Answered below: Yes.) (Suggested answer: Yes.)

2

## COUNTERSTATEMENT OF THE STANDARD OF REVIEW

This Court's standard of review of a district court's grant of a motion for summary judgment is *de novo*. <u>See</u> <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 130 n.6 (3d Cir. 2001). In conducting its review, all reasonable inferences from the record must be drawn in favor of the nonmoving party, and the Court may not weigh the evidence or assess credibility. <u>See</u> <u>MBIA Ins. Corp. v. Royal Indem. Co.</u>, 426 F.3d 204, 209 (3d Cir. 2005).

## COUNTERSTATEMENT OF THE CASE AND OF THE FACTS

Plaintiff-Appellant John McCrorey challenges the District Court's order granting summary judgment against him on his age discrimination and retaliation claims, made under the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act. Lt. McCrorey was a supervising lieutenant in the City of Philadelphia Police Department ("City" or "Department") Narcotics Field Unit. He asserted that the Department discriminated against him because of his age by internally reassigning him to supervise another squad (doing the exact same job within the same unit), and retaliated against him for filing an EEOC complaint by denying his request for an extension of his retirement date under the City's Deferred Retirement Option Program ("DROP").

### I.    Statement of the Facts

#### A.    1982: Lt. McCrorey joins the Philadelphia Police Department.

Lt. McCrorey began working for the City as a police officer in 1982. Appx038 (Compl. ¶ 21). He rose through Police Department ranks, eventually becoming a lieutenant in 1994. Appx199 (McCrorey Dep. 41:2-5). He retired in October 2021. Appx191 (Id. 8:16-18).

#### B.    2013 to 2020: Lieutenant McCrorey works in the Police Department's Narcotics Field Unit, supervising East Squad.

Lt. McCrorey worked in the Narcotics Bureau for roughly the last sixteen years of his career, the final seven or eight in the Narcotics Field Unit (NFU). Appx200-201 (Id. 43:1-3, 46:5-13). The NFU is a plain clothes unit that investigates mid-level drug crimes; it is one of three units in the Narcotics Bureau, the other two being the Narcotics Strike Force (NSF), and Narcotics Intensive

Drug Investigations Squad (IDIS). Appx201 (Id. 46:17, 47:2-4); Appx091 (Flacco Dep. 15:4-12). At that time, the NFU was divided into six divisions/squads that covered different geographical regions of the City: Northeast, Northwest, Central, East, South and Southwest. Appx093 (Flacco Dep. 22:5-20). Typically, each NFU squad was staffed by one lieutenant, a sergeant and several officers. Id. Squad lieutenants reported to the captain in charge of the NFU (here, then-Captain David Merrick), who reported to an Inspector who oversaw the NFU and the Narcotics Strike Force (here, Inspector Jamill Taylor). Appx091 (Id. 15:20-4, 16:1-7). The Inspector, in turn, reported directly to a Chief Inspector, who oversaw the entire Narcotics Bureau. Id.

From approximately 2014 to 2020, Lt. McCrorey supervised the East Squad. East Squad includes the Kensington neighborhood, home to the largest open-air drug market on the East Coast of the United States. Appx109-10 (Id. 87:1-2, 93:10-12); Appx201 (McCrorey Dep. 48:14-17); Appx062, 310 (ECF 25, City SOF & ECF 30-2, Plf. Resp. ¶14). Lt. McCrorey led investigations into the narcotics organizations operating within the squad's boundaries. Appx101 (Flacco Dep. 54:1-4).

### C.    Around 2017: Lt. McCrorey enrolls in the DROP program, committing to retiring by October 23, 2021.

Lt. McCrorey enrolled in the City's Deferred Retirement Option Program ("DROP") around 2017. Appx191 (McCrorey Dep. 9:8-15).

Authorized by City ordinance, DROP is an optional program that permits retirement-eligible employees to make an irrevocable commitment to retire within

four years. Id.; Phila. Code § 22-310(2). In exchange, during those four years, the City pays participants their full salaries while also depositing their pension into an interest-bearing account. Id. Upon retirement, DROP participants get a lump-sum payment of the accumulated pension payments and interest earnings. Id. The DROP program is designed to assist the City with succession planning by giving it information on "exactly when individuals are retiring, and which positions will need to be backfilled." Appx276-77 (Ferguson Dep. 45:13-46:2); Appx080, 353 (City SOF & Plf. Resp. ¶ 133-34). It facilitates smooth transitions by allowing experienced retiring employees to train or impart knowledge to less seasoned employees ahead of the retiring person's DROP date. Id.; Appx269-70 (Ferguson Dep. 17:9-21, 18:22-19:3); Appx123 (Flacco Dep. 143:2-144:18).

When he enrolled in DROP, Lt. McCrorey committed to retire by October 23, 2021, when he would be 61. Appx191 (McCrorey Dep. 8:17-8, 9:18-9).

### D.    July 2020: Chief Flacco is appointed as Chief Inspector of the Narcotics Bureau.

In July 2020,[1] Chief Inspector Christopher Flacco was assigned to oversee the Police Department's Narcotics Bureau. Appx105 (Flacco Dep. 73:15-6). Flacco was recruited by then-First Deputy Commissioner (and second-in-command to the Police Commissioner) Melvin Singleton, who tasked him with "quote, unquote, fix[ing]" the Bureau, which had been plagued by a variety of issues. Appx112-113

---

[1] Chief Flacco was on vacation when he was appointed to Narcotics, so he did not actually begin serving until August of 2020. Appx092 (Flacco Dep. 19:16:21).

(Id. 99:3-18, 104:8-19). Indeed, the problems had been so endemic that Singleton tasked Flacco with "do[ing] what [he had] to do to fix [the Bureau] and get it working." Appx112 (Id. 99:16-18, 100: 8:10). Singleton particularly wanted Flacco to revamp the East Squad's enforcement strategy. Appx104 (Id. 67:1-3).

Prior to his new role, Chief Flacco was in charge of the Police Department's Office of Professional Responsibility ("OPR") for seven and a half years. Appx100 (Id. 51:23-4, 52:1-2). OPR includes Internal Affairs and the Department's Equal Employment Opportunity unit. Appx095 (Id. 32:2-6, 33:3-14). In his prior role, Narcotics Bureau investigations "took up a lot of [his] time," giving Flacco "a pretty . . . good picture of the entire Narcotics Bureau and how it operated." Appx100, 113 (Id. 51:14-24, 52:8-14, 102:1-2). The Chief observed a variety of issues in the Bureau, including overtime abuse and inadequate supervision of squads. Appx104, 112-113, 115 (Id. 69:17-24, 101:19-102:1-2, 104:8-105:5, 111:10-16). He also became familiar with the Bureau's lieutenants, including "their strengths, [and] their weaknesses." Appx100 (Id. 51:16-19). While Flacco did not hold any "particular opinion" about Lt. McCrorey, he was "not impressed with the Narcotics Bureau as a whole." Appx099, 103 (Id. 48:23-49:3, 62:5-9, 63:4-5).

**E.    August and September 2020: Chief Flacco evaluates the Narcotics Bureau.**

Chief Flacco anticipated that change in the Narcotics Bureau would "be met with a lot of resistance." Appx112 (Flacco Dep.101:15-18). Still, the Chief let everyone know they would "get a fresh start" and an "opportunity to succeed"

under his leadership. Appx112 (Id. 101:1-15). He also took time upon his arrival — roughly two months — to evaluate the Bureau and decide what direction to take it in. Appx380 (Taylor Dep. 37:13-38:3).

Early in his tenure, the Chief instituted weekly meetings with the NFU squads (called "huddles"). Appx099 (Flacco Dep.46:13-18, 47:11-22). Also, to combat what he saw as overtime abuse, he made significant changes to the unit's overtime policy. This included discontinuing the two hours of daily overtime officers had been automatically receiving. Appx101-102, 136 (Id. 57:14-20, 212:3-5); Appx378 (Taylor Dep. 26:21-27:13). Flacco also began mandating supervisor approval of all overtime requests (the Captain could approve up to two hours; anything more had to go to the Inspector) and approval was made contingent on overtime furthering a narcotics investigation. Appx102, 136 (Flacco Dep. 58:18-60:19, 211:9-12, 212:2-5, 213:5-7).

The Chief also aimed to familiarize himself with the Bureau's personnel needs. Appx106 (Flacco Dep. 74:8-12); Appx380 (Taylor Dep. 37:20-4). During early huddle meetings in August and September 2020, Flacco therefore asked who was enrolled in DROP. Appx105-106 (Flacco Dep. 71:20-72:2, 73:20-22, 74:8-12). By garnering this information, the Chief could plan to fill those vacancies in advance. Id.

During his first couple months on the job, Chief Flacco also developed a comprehensive Narcotics Enforcement Strategy ("NES"). Appx115-116 (Id. 111:9-17, 114:19-117:3). The NES imagined closer supervision by NFU lieutenants of

their squads[2] and longer investigations that targeted dealers further up the supply chain. Appx115-116 (Id. 111:9-17, 114:19-117:3).[3] As part of implementing the plan, Flacco decided to internally rearrange who oversaw East Squad. Appx104, 110, 131-132 (Id. 68:8-12, 93:16-17, 192:22-193:9, 194:1-2, 195:7-10, 199:17-19); Appx381 (Taylor Dep. 38:4-13, 39:1-4, 16-17). Over the course of numerous discussions, Flacco and Inspector Jamill Taylor discussed every lieutenant and who would be the best fit for the East Squad position. Appx134-135 (Flacco Dep. 204:20-24, 207:11-12); Appx385 (Taylor Dep. 55:20-21).

Ultimately, Chief Flacco and Inspector Taylor both agreed that Lieutenant Marques Newsome, who previously supervised Northwest Squad and was in his forties, was the right choice for East Squad. Appx104 (Flacco Dep. 68:13-9); Appx381 (Taylor. Dep. 38:20-21). The Chief noted Lt. Newsome was the only lieutenant who was buying into, rather than resisting, Chief Flacco's strategy. Appx132 (Flacco Dep. 198:18-199:2). Flacco was also "incredibly impressed"

---

[2] Chief Flacco said he learned from his time with OPR that "supervisors didn't supervise the squads. Sergeants didn't supervise the squads. The cops – the police officers basically dictated where they were going to go make drug buys with no strategy or very little input." Appx115 (Flacco Dep. 111:10-16).

[3] The details of Chief Flacco's proposed strategy, the Narcotics Enforcement Strategy ("NES"), are laid out in a memorandum dated September 28, 2020. Because of the confidential nature of the NES, certain documents were filed under seal in this matter, including the NES Memo itself (ECF 27); the City's unredacted Statement of Material Facts (ECF 26) (a redacted version was filed at ECF 25-3); McCrorey's unredacted Response to the City's Statement of Material Facts (ECF 31) (a redacted version was filed at ECF 30-2); and the District Court's unredacted Memorandum Opinion (ECF 47) (a redacted version was filed at ECF 51). Although not in the Appendix, those documents are available for review in the original record.

with the way Lt. Newsome had recently handled a dangerous narcotics buy turned gun battle. Appx131-132 (Id. 194:15-195:10).

**F.    September 22, 2020: Chief Flacco announces his intent to move certain NFU supervisors to different geographic squads within the Unit, including Lt. McCrorey.**

During the September 22, 2020 huddle meeting, Chief Flacco announced his intent to internally reassign certain supervisors to different geographic squads within the NFU. Appx118 (Id. 122:19-24); Appx380 (Taylor Dep. 37:20-4). Lt. Newsome would supervise East Squad. Id. Lt. McCrorey would oversee Northwest Squad. (McCrorey Dep. 65:6-7). Chief Flacco also moved Lt. Daniel Brooks, previously Captain Merrick's administrative lieutenant, to the Southwest Squad, and put Lt. Payne in charge of South Squad. Appx425 (Merrick Dep. 17:12-17); Appx094 (Flacco Dep. 27:13-22); Appx381 (Taylor Dep. 38:24-39:1).

Each of the reassigned lieutenants maintained the same job, with the same base pay, rank, hours, supervisory structure, dress (plain clothes) and job responsibilities. Appx101, 130 (Flacco Dep. 57:4-8, 190:11-14); Appx381 (Taylor Dep. 39:23-4, 43:9-10); Appx210-11 (McCrorey Dep. 85:18-86:4). They were just shifted to oversee squads covering different geographic parts of the City. Id.

Lt. McCrorey was unhappy with the decision to move him to Northwest Squad. He told Captain Merrick that he just "want[ed] to work with the guys [he] like[d]" as he approached retirement. Appx208 (McCrorey Dep. 75:11-13). He announced he "c[ould]n't do this anymore. . . . [he] c[ould]n't deal with this guy upstairs [Chief Inspector Flacco]" and therefore planned to "get a doctor's note and . . . start running [his sick] time." Appx439 (Merrick Dep. 71:15-22; 72:7-8).

### G. September 23, 2020: The next day, Lt. McCrorey goes out on permanent sick leave.

The following day, on September 23, 2020, Lt. McCrorey went out on sick leave. Appx205, 209-210 (McCrorey Dep. 63:1-6, 78:19-21, 85:3-4). He never again reported for active duty. Id.

### H. February 2021: Lt. McCrorey files a Charge of Discrimination with the EEOC.

On February 23, 2021, Lt. McCrorey filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Appx040 (Compl. ¶ 50). The complaint alleged that Chief Flacco discriminated against McCrorey based on his age by reassigning him to another squad. Id. The EEOC issued a Dismissal and Right to Sue letter in March 2022. Appx037 (Compl. ¶ 15).

### I. July 2021: Lt. McCrorey applies for and is denied a one-year DROP extension.

On July 9, 2021, ten months into his sick leave, Lt. McCrorey applied for a one-year extension of the date he was scheduled to retire under the DROP program. Appx216 (McCrorey Dep 106:20). The Philadelphia Code allows such extensions if the Mayor finds "that an extraordinary circumstance exists which threatens public health, safety and welfare, and [that] it would be in the City's best overall interests" to allow DROP participants in the program's fourth year to extend their City employment for up to one additional year. Phila. Code § 22-310(2)(a).

In July 2021, then-Mayor James Kenney authorized a one-year extension for eligible police officers who were scheduled to retire between July 1, 2021 and June 30, 2022. Appx214 (McCrorey Dep. 98:12-99:22). The purpose of the

authorization was to address a dire shortage of police personnel by putting enough "boots on the ground" to adequately address several emergent situations: an increase in crime, the COVID-19 public health emergency and certain large-scale events that were expected to take place in the City. Appx193, 214 (Id. 14:1-5, 98:18-20). Appx277, 279 (Ferguson Dep. 46:9-14, 57:17-18); Appx264 (City Ex. 14 to Plf. Dep., 7/27/2021 Denial Ltr.); Appx081, 355 (City SOF & Plf. Resp. ¶ 140). The City informed prospective applicants that "in order to support the extraordinary circumstances that ma[d]e th[e] DROP extension necessary," it was "essential" that they be "currently able to perform the essential functions of [their] position" and "able and available for work for the duration of the extended DROP period." Appx257 (City Ex. 12 to Plf. Dep., FAQ at 3); Appx260 (City Ex. 13 to Plf. Dep., DROP Ext. Form); Appx216 (McCrorey Dep. 107:9-17).

Despite having been out on sick leave for approximately ten months, McCrorey applied for an extension. Appx260 (DROP Ext. Form). On July 27, 2021, McCrorey received a letter notifying him that his application had been denied. Appx217 (Id. 112:5-24); Appx264 (7/27/2021 Denial Ltr.). The letter said the Department "determined that [McCrorey was] not currently able or available to work," rendering him ineligible for an extension. Id.

At the time McCrorey applied in 2021, eligibility determinations were made by the Police Department's then-Deputy Commissioner of Organizational Services Christine Coulter, with support from her then-administrative supervisor Lt. James Ferguson. Appx268-269, 272 (Ferguson Dep. 12:16-22, 13:19-21, 14:7-15:3). Organizational Services is part of an entirely separate branch of the Police

Department and shares no overlap in chain of command with the Narcotics Bureau. Appx106 (Flacco Dep. 76:3-12). Lt. Ferguson vetted the applications, while Deputy Commissioner Coulter made the final eligibility decisions. Appx272-274, 277 (Ferguson Dep. 29:16-23, 33:13-18, 34:16-20, 35:21-36:4, 46:22-47:10). The two denied McCrorey's application because he had been "off sick" for almost a year when he applied and they "belie[ved] that he wasn't coming back to work." Appx274, 277 (Id. 36:8-12, 48:9-14).

> **J.    October 23, 2021: McCrorey retires having never reported for work to lead Northwest Squad.**

After thirteen months on sick leave, Lt. McCrorey retired on October 23, 2021, his predetermined DROP date. Appx191 (McCrorey Dep. 8:16-18). He admits he "never showed up" to supervise Northwest Squad. Appx 205, 210 (McCrorey Dep. 63:1-6, 85:3-4).

## II.    Statement of the Case

Lt. McCrorey filed a complaint against the City of Philadelphia asserting claims of age discrimination and retaliation in alleged violation of the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act. Appx035-044 (ECF 1, Compl.).

On March 29, 2023, the City moved for summary judgment. Appx031-032 (Docket at ECF No. 25-27). Lt. McCrorey responded in opposition, and the City filed a reply. Appx032 (Docket at ECF 30, 34). The District Court held oral argument on May 16, 2023. Appx032 (Docket at ECF 35).

The District Court granted the City's motion in its entirety and entered

judgment in the City's favor and against Lt. McCrorey. Appx004-028 (Dist. Ct. Op.); (7/26/23 Dist. Ct. Order). The Court granted summary judgment against McCrorey on his age discrimination claim because it determined he did not establish the reassignment constituted "adverse employment action." Appx015-021 (Dist. Ct. Op. 12-19). It concluded McCrorey's mere "subjective preference" for staying on East Squad was not enough; McCrorey needed to, but did not, offer sufficient proof that East Squad was "objectively better" than Northwest Squad. Appx017-018 (Id. 14-15), quoting Swain v. City of Vineland, 457 Fed.Appx. 107, 110 (3d Cir. 2012) (unreported).

On the retaliation claim, the Court found that McCrorey did not establish that denying his request to extend his mandatory "DROP" retirement date was materially adverse action or show any causal link between the protected activity and the City's alleged retaliation. Appx021-028 (Dist. Ct. Op. 19-25). Lt. McCrorey appealed to this Court. Appx033 (Docket at ECF 53).

## SUMMARY OF ARGUMENT

The District Court properly granted summary judgment against Plaintiff-Appellant John McCrorey, a former police lieutenant in Philadelphia's Narcotics Field Unit, who claimed he was discriminated against based on his age (60) and retaliated against for filing an EEOC complaint against his boss.

The age discrimination claims fail for two independent and alternative reasons. First, Lt. McCrorey did not meet his burden to make out a *prima facie* claim. Part and parcel of the new leader's larger effort to revamp the Narcotics Bureau, Chief Inspector Flacco internally reassigned McCrorey to the exact same job (Squad supervisor) within the same unit (the Narcotics Field Unit), just changing the geographic squad McCrorey was to oversee. McCrorey proffered insufficient proof that the new Squad (Northwest) was objectively worse than the old one (East) or that this decision did anything to negatively change an identifiable term or condition of his job, as the Supreme Court's new decision in Muldrow requires.

Second, as a new boss who wanted to do things differently than his predecessor, Chief Flacco made an entirely legitimate choice to change up the Field Unit supervisors and appoint someone other than Lt. McCrorey as the East Squad supervisor (Lt. Newsome), while moving McCrorey to Northwest Squad. Newsome was a motivated and impressive performer.  He bought into the new Chief's ideas, and he was committed to carrying out Flacco's narcotics strategy. It was Flacco's prerogative to make these changes, and McCrorey offered insufficient evidence to support a competent inference that Flacco's legitimate

reasons were pretextual.

The District Court also correctly granted summary judgment on Lt. McCrorey's retaliation claims, which fail three times over. First, undisputed record evidence establishes Lt. McCrorey did not qualify for an extension under neutral criteria that applied to all DROP extension applicants. Under those facts, no reasonable employee would deem this action materially adverse. Second, there is absolutely no evidence of any causal nexus between Lt. McCrorey's EEOC complaint against Flacco and the denial of his DROP extension request five months later. The denial was made by people in an entirely different arm of the Police Department who did not know about the EEOC charge. Finally, Lt. McCrorey did not put forth any evidence contradicting the core facts supporting the Department's legitimate reason for denying his extension request — that he was facially ineligible for the program due to his prolonged sick leave — and thus did not demonstrate pretext.

# ARGUMENT

Plaintiff-Appellant John McCrorey, a former narcotics lieutenant in the Philadelphia Police Department, filed claims for age discrimination and retaliation under the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act. The District Court granted summary judgment against him on both claims, correctly finding that Lt. McCrorey proffered insufficient evidence to establish liability. The age discrimination claim fails as a matter of law because McCrorey did not establish that the decision to reassign him to a different squad caused him any harm and because he produced insufficient evidence that his boss' legitimate reasons for doing so were pretextual. The retaliation claim also fails, as McCrorey did not show that the DROP extension denial was materially adverse (given that he was facially ineligible), did not establish causation and did not put forth any evidence contradicting the core facts supporting the Department's legitimate reason for denying the extension: that he was facially ineligible.

## I.    The District Court properly rejected Lt. McCrorey's claim for alleged age discrimination under the ADEA and PHRA.

### A.    The <u>McDonnell Douglas</u> framework.

Under the Age Discrimination in Employment Act ("ADEA") of 1967, 29 U.S.C. § 621 *et. seq.* and the analogous provision of the Pennsylvania Human Relations Act ("PHRA"), Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's age." 29 U.S.C. § 623(a)(1); 43 P.S. § 955(a).

ADEA and PHRA age discrimination claims are analyzed under the familiar three-step burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Martinez v. UPMC Susquehanna, 986 F.3d 261, 265-66 (3d Cir. 2021); Smith v. City of Allentown, 589 F.3d 684, 690-91 (3d Cir. 2009). At step one, the plaintiff must make out a prima facie case of age discrimination. Id. To do so, the plaintiff must demonstrate that: (1) he or she is at least forty; (2) he or she is qualified for the job; (3) suffered an adverse employment action; and (4) he or she was replaced by (or passed over in favor of) someone else who was sufficiently younger so as to support an inference of a discriminatory motive. Id. At step two, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. Id. Finally, should the employer carry this burden, the employee must then establish that the legitimate reason offered by the employer was not the true reason, but was a pretext for discrimination. Id. An ADEA (and PHRA) plaintiff retains the ultimate burden of showing that his age was a "but-for" cause of his employer's action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009), quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993). This requires a showing that age had a "determinative influence on the outcome," and was not merely a "motivating factor." Id.[4]

---

[4] The ADEA, unlike Title VII, does not "authorize[] a mixed-motives age discrimination claim." Gross, 557 U.S. at 175.

Here, Lt. McCrorey claimed that Chief Flacco's decision to move McCrorey to Northwest Squad and put a younger lieutenant in charge of East Squad constitutes age discrimination. (ECF 30-1, Plf. Resp. Opp. City MSJ, MoL at 1, 4-14). The District Court correctly held that the evidence McCrorey offered fell far short of what was necessary to survive summary judgment.

### B.  The District Court properly determined Lt. McCrorey did not make out a *prima facie* claim of age discrimination.

First, the District Court properly concluded that Lt. McCrorey did not make out a *prima facie* case of age discrimination because it determined he did not establish a reassignment from the NFU's East to Northwest Squad would constitute "adverse employment action." Appx015-021 (Dist. Ct. Op.12-19).

As Lt. McCrorey pointed out in his  supplemental brief, the Supreme Court recently decided <u>Muldrow v. City of St. Louis, Missouri</u>, 22-193, 601 U.S. --, 144 S.Ct. 967, 2024 WL 1642826 (U.S. Apr. 17, 2024), during the pendency of this appeal. <u>Muldrow</u> holds that an employee subject to a forced transfer must show "some harm," but need not demonstrate harm that is "significant." <u>Id.</u> at *3, 5. McCrorey maintains that <u>Muldrow</u> controls and requires this Court to decide the age discrimination claim in his favor. Plf. Supp. Br. at 2-7.

Yet, the Court need not, and should not, do so. First, the facts of this case could not be less like <u>Muldrow</u>, where the plaintiff (a female police sergeant) was forced to leave a satisfying assignment of nine years to do an *entirely new job*, where she lost numerous objective benefits (including doing specialty priority investigative work, FBI credentials, a take home car, regular hours, and dressing in

plain clothes), because her male commander did not think she could handle her old post's "very dangerous" work. Muldrow, 2024 WL 1642826 at *3. Second, pre-or post-Muldrow, the *standard of proof* necessary to withstand summary judgment remains the same: the plaintiff must proffer sufficient *non-speculative, objective evidence* to substantiate whatever level of harm the Court requires. See, e.g., Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014); Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 76 (3d Cir. 1996). The instant record contains insufficient non-speculative, objective evidence to establish that reassigning Lt. McCrorey to Northwest Squad would have brought about any "disadvantageous change" with respect to a term or condition of McCrorey's employment, leaving him "worse off." Muldrow, 2024 WL 1642826 at *6-7.  In short, this Court should not remand because "a remand would be a waste of judicial resources" given that "application of the [new] standard [set forth in Muldrow] could support only one conclusion": that the discrimination claim still fails. Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175, 183 (3d Cir. 2010).

> **1.    The Supreme Court's April 2024 decision in Muldrow.**

In Muldrow, a female police sergeant brought a sex discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq*. (Title VII). Her suit challenged the St. Louis Police Department's decision to transfer her out of the Intelligence Division, a specialized unit that investigates high-priority matters, where Muldrow had regular hours, an unmarked take-home vehicle and got to work in plainclothes. Muldrow, 2024 WL 1642826 at *3-4, 7. After the forced transfer, Muldrow worked a uniformed job in the Department's Fifth

District supervising the day-to-day activities of neighborhood patrol officers; the job did not come with a car and required her to work weekends. The District Court granted summary judgment in the city's favor and the Eighth Circuit affirmed, holding that Muldrow had to—but did not—satisfy that circuit's test requiring a Title VII plaintiff to show that the challenged transfer caused her a "materially significant disadvantage." Id.

The Supreme Court reversed and remanded. The 6-justice majority dispensed with the Eighth Circuit's "materially significant disadvantage" test as well as any other "heightened threshold of harm" imposed on Title VII claimants challenging discriminatory job transfers, be it "significant . . . [o]r serious, or substantial or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." Id. at *4-5. (Justice Kagan authored the majority opinion; Justices Thomas, Alito, and Kavanaugh each filed opinions concurring in the judgment). Imposing a heightened bar, said the Court, is to rewrite Title VII and compel workers to make a showing that the statutory text of 42 U.S.C. § 2000e-2(a)(1) does not require. Id. at *5.

Instead, the Court held a discriminatory-transfer plaintiff, as part of making out a *prima facie* case, needs to show at least "some harm" or "some injury" "with respect to" his or her employment "terms [or] conditions" "beyond the harm of being transferred on the basis of race, color, religion, sex, or national origin." Id. at *3, *5. To satisfy this requirement, the plaintiff must show that "the transfer brought about some 'disadvantageous' change in an employment term or condition" that leaves the employee "worse off." Id. at *6-7.

21

Notably, the Court's majority *did not* adopt the test advocated by Muldrow (adopted by Justice Kavanaugh in his single-justice concurrence): that a plaintiff needs to show nothing more than that she was transferred and that the facts give rise to an inference of discriminatory intent. Id. at *8-9 (Kavanaugh, J., concurring). With its "some harm" test, the Court chose a middle-ground.

Looking at the numerous factors indicating that Muldrow's new job was objectively adverse, the Court deemed Sergeant Muldrow's allegations as preliminarily meeting the Court's "some harm" "test with room to spare" and remanded the case for further proceedings. Id. at *7. However, it was careful to point out her claim would only survive "if [the allegations were] properly preserved and supported." Id. Indeed, it expressly gave the District Court and Eighth Circuit permission to revisit potential deficiencies in proof on remand. Id. ("both courts suggested that some of the allegations Muldrow made about the nature of the work she did in her old and new jobs lacked adequate evidentiary support. We leave such matters for the courts below to address" on remand).

### 2.    There is insufficient record evidence to create a fact question as to whether reassigning Lt. McCrorey to Northwest Squad caused any harm.

We do not dispute, as least in cases where a transfer is at issue, that Muldrow sets out what a plaintiff must show to establish "adverse employment action."[5] We also do not dispute that courts will extend the test articulated in

---

[5] We take no position as to what, if any, effect Muldrow will have more broadly on this Court's "adverse employment action" caselaw.

Muldrow (a Title VII case) to ADEA claims, because except for the substitution of which classes of individuals the statutes protect, the text of the two statutes are virtually identical.[6] And since this ADEA case arguably involves a transfer, we take no issue with McCrorey's claim that Muldrow applies here. However, Lt. McCrorey's claim fails because the record of harm in this case is so lacking that it does not satisfy even the relatively low bar set by Muldrow.[7]

No one disputes that McCrorey was asked to do the same job in the same unit — where he was to have the exact same job responsibilities, base pay, rank, hours, supervisory structure and dress (plain clothes) — just overseeing a squad that covered a different area of the City. Appx381 (Taylor Dep. 39:23-4, 43:9-10);

---

[6] Compare 42 U.S.C. § 2000e–2(a)(1) (Title VII) (making it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1)), with 29 U.S.C. § 623(a)(1) (ADEA) (making it unlawful to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age"),

[7] As a threshold matter, the ADEA and PHRA prohibit an *employer* from discriminating. 29 U.S.C. § 623(a)(1); 43 P.S. § 955(a). Here, Chief Flacco's decision did nothing to Lt. McCrorey because he admittedly *never reported for duty* to supervise Northwest Squad. Appx 205, 210 (McCrorey Dep. 63:3-6, 85:3-4). Instead, because McCrorey disagreed with the reassignment and decided he "c[ould]n't deal" anymore, he unilaterally "decided to start running time, and . . . just le[ave]," effectively being paid his full salary while not working. Appx439 (Merrick Dep. 71:15-22; 72:7-8). McCrorey's choice to run sick time rather than report to work, not Flacco's decision to reassign McCrorey to supervise a different geographical squad, is what "brought about [any] 'disadvantageous' change" to his employment and left him "worse off." Muldrow, 2024 WL 1642826 at *6-7. This alone precludes Lt. McCrorey's assertion that he satisfied Muldrow's "some harm" requirement. See Larochelle v. Wilmac Corp., 769 Fed.Appx. 57, 60 (3d Cir. 2019) (unreported) ("[v]oluntary resignation is not an adverse employment action").

Appx210-11 (McCrorey Dep. 85:18-86:4); Appx101, 130 (Flacco Dep. 57:4-8, 190:11-14); Appx101 (Id. 54:10-13) (noting that outside of administrative lieutenants, "[a]ll of the lieutenants [in the NFU] . . . have the same responsibilit[ies]").

While Lt. McCrorey undoubtedly would have preferred that Flacco maintain the *status quo* — after all, he "want[ed] to work with the guys [he] like[d]" as he was "getting ready to retire" — that is simply not enough. Muldrow's "some harm" test was clearly meant to establish a floor that weeds out claims challenging actions that effect *de minimus* or trifling harm and objectively leave workers no worse off. This is that case.

Indeed, the facts of this case could not be less like Muldrow, where the sergeant was forced to leave a satisfying assignment of nine years to do an entirely new job because her male commander did not think she could handle her old post's "very dangerous" work. Muldrow, 2024 WL 1642826 at *3. The difference in the nature of her work was stark: the old position was in Department's Intelligence Division, a prestigious specialized unit that gave her substantial responsibility over priority investigations of public corruption, human trafficking, gang and gun crime; frequent opportunities to work with top brass as well as the Federal Bureau of Investigation (as a deputized task force officer that had authority to pursue investigations outside the city). Id. at *3-4, 7 By contrast, the new position was with one of the city's six patrol districts, where her work supervising the day-to-day activities of patrol officers was mostly administrative, including approving arrests and reviewing reports. Id. The first job also offered numerous objective

24

advantages that Muldrow lost when she was compelled to transfer: dressing in plainclothes, traditional Monday-through-Friday workweek hours, and an unmarked take-home vehicle. Id. In the new position, she had to wear a uniform, had a less regular schedule that often required her to work weekends and did not get FBI credentials or the take-home car that came with it. Id.

None of the objective, articulable factors that led the Court to conclude that Sergeant Muldrow was patently left "worse off" in her new job are present here. Nor is anything similar. Instead, Lt. McCrorey points to three largely subjective "losses" to substantiate his claim of harm. He first states Northwest Squad offered fewer opportunities for overtime. Appellant Br. at 14-15. Second, he deemed Northwest Squad less prestigious than East Squad. Id. at 15-18; Plf. Supp. Br. at 3-4. Third, McCrorey asserts not being picked for East Squad hindered his career advancement. Id.

The District Court properly rejected all three of these grounds, finding insufficient non-speculative evidence to create a fact question as to whether the reassignment to Northwest Squad left McCrorey objectively worse off. Although the District Court cited this Court's pre-Muldrow caselaw, its conclusion that McCrorey's evidence was incompetent is still correct when viewed under the Muldrow "some harm" lens. Indeed, Muldrow specifically acknowledges that allegations of harm must be "properly preserved and supported" and "lack[] [of] adequate evidentiary support" can doom an otherwise valid *prima facie* case of discrimination. Muldrow, 2024 WL 1642826 at *7.

The only record evidence regarding overtime is McCrorey's conclusory

assertion that he expected he would see a "dramatic reduction" in overtime in Northwest Squad. Appx210 (McCrorey Dep. 85:3-12). The District Court correctly found that claim was far too speculative to survive summary judgment. Appx020 (Dist. Ct. Op. 17). Indeed, Lt. McCrorey simply *assumed* — and offered "vague assumptions" at that — that more overtime would be available in East Squad. Id. Yet he only had the more liberal overtime practices of past Chiefs on which to base this assumption. It is undisputed that one of the first things Chief Flacco did when he came to the Narcotics Bureau was reign in overtime use, allowing it only when necessary to further an investigation and when approved by a supervisor. Appx099, 101-102, 136 (Flacco Dep. 47:11-4, 57:14-60:9, 212:3-5). Therefore, as Flacco explained, it is the complexity of a particular investigation, not the squad to which an officer is assigned, that drives access to overtime. Appx138 (Id. 221:6-222:8) ("[a]t different points each squad would request or require more" or less overtime).

On this record, the District Court properly determined that McCrorey's overtime claim was as speculative as the plaintiff in Swain v. City of Vineland, 457 Fed.Appx. 107, 110 (3d Cir. 2012) (unreported); Appx020 (Dist. Ct. Op. 17). There, this Court held that "a speculative increase in potential overtime [attendant to a police sergeant's request for a transfer from street crimes to K–9 unit] does not qualify as a change in the terms or conditions of employment, particularly where one's current position, as here, offers its own opportunities to earn overtime." Id. at 111. As in Swain, there is no dispute here that Northwest Squad "offers its own opportunities to earn overtime." Id.; see also Halsey, 750 F.3d at 287 ("speculation or conjecture does not create a material factual dispute sufficient to defeat

summary judgment"); Fedorczyk, 82 F.3d at 76 ("[b]ased on the evidence presented, a jury could only speculate" as to whether the defendant's actions actually caused the claimed injury).

The suggestion that Northwest Squad was less prestigious is equally speculative. The District Court was correct in finding McCrorey "offer[ed] no characterization of the Northwest Squad's prestige relative to that of the East Squad," *i.e.*, he did not point to concrete evidence substantiating his assertion of lesser "prestige" or offer any specific comparison between the two particular positions. Appx020-021 (Dist. Ct. Op. 17-18), citing Freeman v. Potter, 200 Fed.Appx. 439, 444 (6th Cir. 2006) ("'Prestige,' much like beauty, is in the eye of the beholder . . . Yet, because we rely upon objective factors, rather than subjective impressions, we must look underneath an assertion of 'prestige' to determine whether there is anything concrete to substantiate it").

While Lt. McCrorey summarily attempts to equate the attention Chief Flacco placed on East Squad with purported "prestige," his judgment on this matter is entirely subjective and based on conjecture. Chief Flacco *had* to focus on East Squad because drug crime in that area far exceeds other areas of the City. Indeed, Kensington houses the largest open-air drug market on the East Coast and the proliferation of drugs there has held an entire neighborhood captive for years. Dedicating resources to combat the illicit drug trade in that area is a necessity, not a choice and not an objective sign of prestige. Indeed, being forced to police this difficult area could just as easily be seen as leaving an officer objectively worse off, not better. See Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 412 (3d Cir.

1999) (transfer to teach in school that had a reputation of being a "difficult" was adverse).[8]

Finally, the District Court correctly rejected McCrorey's hollow claim that his "non-selection to the new East squad lieutenant position negatively impacted his career." Appellant Br. at 16. Although it is inappropriate at the summary judgment stage for a court to resolve factual disputes or make credibility determinations, a court is not required "to turn a blind eye to the weight of the evidence." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Here, the undisputed record evidence established that when Chief Flacco made his decision in September 2020, McCrorey had spent almost four decades in the Department and had just one year left before he *had* to retire in October 2021. Given those facts, the District Court had ample basis to reject McCrorey's claim, as only speculation or conjecture could have led a jury to find that the move jeopardized Lt. McCrorey's opportunities for career advancement

---

[8] The record simply does not support McCrorey's hyperbolic claim that Chief Flacco "used an extensive, competitive process to select the one new lieutenant for the East squad [and that] the East squad focused on an innovative, ground breaking strategy, which required an enhanced skill set." Appellant's Br. at 18. Chief Flacco focused on East Squad because that is where the City's heaviest drug crime took place and, in turn, where attention was most needed. Appx109-10 (Flacco Dep. 87:1-2, 93:10-12); Appx201 (McCrorey Dep. 48:14-17); Appx062, 310 (ECF 25, City SOF & ECF 30-2, Plf. Resp. ¶14). Further, the record evidence of the "process" used for selecting who would oversee East Squad was limited to Flacco and Inspector Jamill Taylor discussing who among the NFU lieutenants would be the best fit. Appx134-135 (Flacco Dep. 204:20-24, 207:11-12); Appx385 (Taylor Dep. 55:20-21). This is a far cry from the "extensive, competitive [selection] process" that demanded the "enhanced skill set" McCrorey describes.

and professional growth. Appx020 (Dist. Ct. Op. 17).[9]

Accordingly, this Court should have no hesitation in finding what the District Court found: that the evidence of harm in this record falls far short of what is prescribed to withstand summary judgment. The deficiency in proof of harm is fatal here.

### C.    Alternatively, Lt. McCrorey failed to offer sufficient evidence of pretext to survive summary judgment.

Assuming *arguendo* that Lt. McCrorey established a *prima facie* case of age discrimination (he did not), this Court should still affirm the grant of summary judgment because the claim fails on another, alternative basis. Chief Flacco made a legitimate, non-discriminatory managerial decision to put Lt. Newsome in charge of East Squad and move McCrorey to Northwest Squad. And Lt. McCrorey did not rebut that with minimally sufficient evidence of pretext. Although the District Court did not reach this argument, it was presented in the summary judgment papers and this Court may affirm on grounds other than those considered by the District Court. See Hughes v. Long, 242 F.3d 121, 122 n.1 (3d Cir. 2001); ECF 25-

---

[9] To the extent McCrorey obliquely suggests the proposed reassignment left him "worse off" because he wanted to finish his career out with his friends in the East Squad, this is easily dismissed. Merely "want[ing] to work with the guys [he] like[d]" as he approached retirement is clearly not the type of harm contemplated by Muldrow. Supp. Br. at 5; Appx208 (McCrorey Dep. 75:11-13).

Lt. McCrorey also argues Northwest Squad was "inferior" to East because it was smaller, *i.e.*, was staffed by fewer officers. Appellant Br. at 15. He did not raise this argument in opposition to summary judgment below, rendering it waived and/or forfeited. (ECF 30-1, Plf. Resp. Opp. City MSJ, MoL at 5-9). He also does not explain how size correlates to East Squad being objectively better.

2, City MSJ, MoL at 8-12; ECF 30-1, Plf. Resp. Opp. City MSJ, MoL at 9-14. This is an additional reason to decide the case now, rather than remanding on adverse action in light of the intervening <u>Muldrow</u> decision.

           **1.**    **Chief Flacco had legitimate managerial reasons for putting Lt. Newsome in charge of East Squad and moving Lt. McCrorey to Northwest Squad.**

The City offered ample explanation for Chief Flacco's decision to put Lt. Newsome in charge of East Squad and to move Lt. McCrorey to Northwest Squad. That is, the new boss wanted to do things differently than his predecessor and chose the candidate he believed would best move his plans for change forward.

As this Court has explained, it does "not sit as a super-personnel department that reexamines an entity's business decisions"; an employer "may have any reason or no reason for [making a decision] so long as it is not a discriminatory reason." <u>Brewer v. Quaker State Oil Ref. Corp.</u>, 72 F.3d 326, 332 (3d Cir. 1995). This Court has "cautioned courts on several occasions to avoid unnecessary intrusion into subjective [employment] decisions." <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 527 (3d Cir. 1992); <u>see also</u> <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1083 (3d Cir.1992) ("[T]he ADEA is a discrimination statute and is not intended to handcuff the management and owners of businesses to the status quo").

Here, it is undisputed that Chief Flacco's September 2020 decision was part and parcel of the new leader's larger effort to revamp the Narcotics Bureau. Indeed, Flacco was brought in to head the Bureau because Department leadership thought it was not "working" and they needed someone to "fix it." Appx112 (Flacco Dep. 99:7-18). As part of rolling out his new strategy, Chief Flacco simply

wanted to change the outgoing chief's supervisory choices. Appx110 (Flacco Dep. 93:16-17); Appx381 (Taylor Dep. 38:4-13, 39:8:18). Doing so was entirely his prerogative. The Chief's initial focus on choosing a leader for East Squad was natural, given that it covers the area with the City's heaviest drug activity. Appx104, 110 (Flacco Dep. 67:1-16, 93:16-17). And there is more than substantial evidence in the record that Flacco's decision was reasoned, well-informed and based on legitimate criteria.

First, it is undisputed that Flacco did not make the choice alone. He relied on the opinion of his subordinate commander Inspector Taylor, who "better . . . kn[e]w the personnel." Appx104, 131-133 (Flacco Dep. 68:8-12, 192:22-193:21, 195:7-10, 199:17-19); Appx381 (Taylor Dep. 38:4-13). Nothing calls into question the Chief and Inspector's consistent testimony that they considered every field unit lieutenant for the East Squad position over the course of "numerous discussions," that they never discussed age and that they "both agreed" Newsome could "best could get the job done." Appx131, 133-135 (Flacco Dep. 194:13-14, 202:9-14, 204:20-24, 207:11-12); Appx381, 385 (Taylor Dep. 41:8-12, 55:20-21).

That choice is amply supported. Lt. Newsome was "the only lieutenant who instead of fighting or resisting what [Chief Flacco] was trying to do" gave the Chief "110 percent in attempting to carry out" the Chief's vision. Appx132 (Flacco Dep. 198:18-199:2). His attitude was in stark contrast to the "absolute[]" resistance displayed by other NFU lieutenants and made him an ideal candidate. Appx118-119 (Id. 124:23-125:3, 126:13-15). Moreover, Chief Flacco was "incredibly impressed" with the way Newsome had handled a recent drug buy turned gun

battle that put officers at risk. Appx131-132 (Id. 194:15-195:10). Finally, Lt. Newsome was one of the few Narcotics Bureau supervisors that Chief Flacco came to the Bureau with a favorable opinion of. In his prior role in OPR, Flacco was "not impressed" with most of the Bureau's lieutenants, but Lt. Newsome was an exception. Appx100, 103 (Id. 51:16-19, 63:4-10). Even Captain Merrick, who disagreed with Chief Flacco's choice of Lt. Newsome to head up East Squad, acknowledged that Newsome was a "rising star" who was "extremely desiring of learning the narcotics investigation." Appx429 (Merrick Dep. 1-11).

Finally, the record fully backs that Chief Flacco's decision was not aimed at moving Lt. McCrorey *out* of East Squad so much as the new Chief finding the right leader *for* East Squad. As Inspector Taylor explained, Flacco "[w]as not singling McCrorey out or punishing McCrorey or anything like that." Appx381 (Taylor Dep. 39:21-23). Rather, he was focused on finding the right squad supervisor who could "accomplish the goals that were being set" by Flacco. Appx131 (Flacco Dep. 193:2-3).

### 2.    Lt. McCrorey offered insufficient evidence of pretext.

Lt. McCrorey, of course, believes that Chief Flacco purposely pushed him out of East Squad because of his age. But he simply failed to produce evidence supporting an inference that the Chief's legitimate reasons for choosing Lt. Newsome over McCrorey were a pretext for discrimination.

To show pretext sufficient to defeat a motion for summary judgment, an employee needs to point to some evidence from which a factfinder could reasonably either: (i) disbelieve the employer's articulated legitimate reasons; or

(ii) believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action. See Palmer v. Britton Indus., Inc., 662 Fed.Appx. 147, 150 (3d Cir. 2016) (unreported), citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). This requires the employee to do more than show a decision was "wrong or mistaken." See Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006). He needs to "present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision." Id. (emphasis in original). Demonstrating pretext is a "difficult burden." Fuentes, 32 F.3d at 765.

In the District Court, Lt. McCrorey relied on a handful of remarks he claims Chief Flacco made as his sole evidence of pretext. (ECF 30-1, Plf. Resp. Opp. City MSJ, MoL at 9-14). Namely, he contends at early huddle meetings in August and September 2020, the Chief : (1) asked who was in the Deferred Retirement Option Plan (DROP) program; (2) remarked that there were "a lot of older officers assigned" to the Narcotics Field Unit and that he wanted to bring "younger officers or supervisors into" the Unit; and (3) stated that he "did not believe that the police force needed a bunch of fifty-year-old cops in uniform acting as an emergency response group" out "on the protest line." Appx038-039 (Compl. ¶¶ 32-36); Appx205 (McCrorey Dep. 63:13-64:19); Appx431-432 (Merrick Dep. 38:3-7, 42:17-44:2).

As a threshold matter, Chief Flacco readily admits to inquiring about DROP and does not dispute remarking about the age of supervisors. Appx105, 123 (Flacco Dep. 71:20-72:2, 142:2-144:5). However, he offers a legitimate explanation for doing so: succession planning. Id.; Appx105-106 (Id. 71:20-75:2).

A plethora of undisputed evidence substantiates this. As Flacco explained, the Narcotics Bureau had already been experiencing ongoing attrition and "a large majority of individuals [left in the Bureau] had enough time and age to retire." Appx123 (Id. 142:19-21). He therefore needed to know "who [he] was going to lose, [and] when [he] was going to lose them" so he could both "bring in newer officers" and have his experienced officers "get them trained up." Appx105-106, 123-124 (Id. 73:3-74:12, 142:23-144:1, 146:8-18). Flacco's inquiries were entirely in line with the documented purpose of DROP, which is to facilitate smooth transitions and ensure continuity of City operations. Appx105, 111, 123 (Id. 73:23-24, 96:13-23, 143:2-144:18); Appx269-70, 276-77 (Ferguson Dep. 17:9-19:3, 45:13-46:2); Appx080, 353 (City SOF & Plf. Resp. ¶¶ 133-134). Far from demonstrating invidious motive, the Chief's comments reflect no more than his desire to be a "good. . . and . . . conscientious manager." Appx124 (Flacco Dep. 148:16-20); see Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 513 (3d Cir. 2004) (supervisors' inquiry about whether employee "was thinking of retiring" not direct evidence of age discrimination because it "could just as easily be explained by a [lawful] desire on [the employer's] part to do some long-term planning"); see also Bianchi v. B & G Mach., Inc., 2023 WL 1879468, at *2-3 (3d Cir. Feb. 10, 2023) (unreported) (employer's remark about desire for "new blood" not direct evidence of age discrimination; termination "had to do with corporate restructuring and [employee's] stature and years at the company, not his years on Earth"); Vasbinder v. Sec'y Dep't of Veterans Affairs, 487 Fed.Appx. 746, 750 (3d Cir. 2012) (unreported) (comment by employer that he was eager for several older

employees to retire was insufficient evidence of discriminatory animus).[10]

More fundamentally, these remarks do not sufficiently cast doubt on the core reasons Chief Flacco chose Lt. Newsome over McCrorey.

First, there is absolutely nothing in the record that suggests Flacco's comments played any role whatsoever in his choice of Lt. Newsome to lead East Squad. The remarks were made outside the context of that decision and concerned the overall future of the Bureau's workforce and the safety of its officers. Nothing contradicts the Chief's and Inspector Taylor's testimony that age and retirement dates played "absolutely" no part in the NFU squad supervisor decision and retirement dates "were only ever discussed as it related to  concerns about manpower replacement. . ." Appx109, 134 (Flacco Dep. 94: 10-16, 205:8-9); Appx381 (Taylor Dep. 41:8-12). Absent evidence to connect Flacco's stray comments to the supervisory decision, which Lt. McCrorey did not offer up, no rational jury could conclude that the explanation Chief Flacco proffered was pretextual. See Sterner v. Siemens Med. Sols. USA, Inc., 706 Fed.Appx. 772, 775 (3d Cir. 2017) (unreported) (even if supervisor mistreated employee and prevented her from receiving training, absent a showing that employee's age had any bearing on employer's decisions claim failed for insufficient evidence as to pretext);

---

[10] While Flacco does not recall making the statement about "a bunch of fifty-year-old cops in uniform," he did explain that keeping officers in plain clothes was a priority for safety reasons. This is because wearing a uniform (and, in turn, grooming to the uniformed standards) risked compromising the NFU's narcotics investigations and being "made as a cop" more easily. Appx125-126 (Flacco Dep. 152:11-24, 157:13-23). It also has nothing to do with, or connection to, the decision that McCrorey challenges here so is irrelevant to his claim of pretext.

Salkovitz v. Pioneer Elecs. (USA) Inc., 188 Fed.Appx. 90, 93-94 (3d Cir. 2006)
(unreported) (email calling employee a "human antique" and comments that
supervisors were aware of his age and expected him to retire after the end of a six-
month consultancy insufficient to show pretext because the employee failed to
connect the statements to the decision to terminate him).

Further, even if Chief Flacco's comments were enough to raise an inference
that Lt. McCrorey's short time left at the Department — or even his age
specifically— played *some* part in the East Squad supervisor decision (they
decidedly do not), that is not enough.

First, controlling caselaw *permits* employers to "take account of" factors that
may be "empirically correlated with" but are "analytically distinct" from age, such
as an employee's pension status or seniority or, as here, DROP participation.
Hazen Paper Co., 507 U.S. at 608, 611; see also Kentucky Retirement Systems v.
EEOC, 554 U.S. 135, 148 (2008) (differential treatment based on pension status
permissible, even where pension status itself turns, in part, on age); Bryan v. Gov't
of Virgin Islands, 916 F.3d 242, 248-49 (3d Cir. 2019) (territorial law requiring
long-tenured employees who declined to retire to pay more into pension system to
induce retirement was reasonable non-age factor even though burden fell
disproportionately on older employees); Kelly v. Moser, Patterson and Sheridan,
LLP, 348 Fed.Appx. 746, 748-51 (3d Cir. 2009) (unreported) (note saying "older
& better paid/younger & cheaper" suggests "age is correlated with cost, a
legitimate consideration under the ADEA").

Second, because an ADEA plaintiff must show that age was the "but for"

cause of the challenged action, *i.e.*, that age had "a determinative influence on the outcome," even evidence that suggests age was a secondary consideration does not necessarily defeat summary judgment. Gross, 557 U.S. at 177-78, quoting Hazen Paper Co., 507 U.S. at 610; see also Kelly, 348 Fed.Appx. at 750-51 (human-resources director's note saying "older & better paid/younger & cheaper" at worst, demonstrated that age was a secondary consideration in decision to fire 52-year-old lawyer but was not enough to establish pretext); Palmer, 662 Fed.Appx. at 150-51, 152-53 (remark that employee might be "too old to change industries" and that age contributed to poor sales performance "was at most evidence that age was a secondary factor in the decision to fire" 63-year-old but not sufficient evidence of pretext).

This Court's decision in Glanzman is instructive. There, the employer asked about the plaintiff's age (63 years old) and whether "she was thinking of retiring." Glanzman, 391 F.3d at 510. The employee also proffered affidavits from two of her former coworkers stating that a few days before she was terminated, a manager commented that he "wanted to fire [the plaintiff] and 'replace her with a young chippie with big tits'." Id. Yet, even with that evidence, which this Court deemed "an admission that at least part of the actual reason for [firing plaintiff] was a desire to hire someone younger and more endowed," this Court determined there was insufficient evidence of pretext to defeat summary judgment. Id. at 512 n.4, 514-15.[11]

---

[11] Glanzman was primarily analyzed under the "direct evidence" analysis set

Lt. McCrorey likewise did not satisfy the "difficult burden" of showing pretext. <u>Fuentes</u>, 32 F.3d at 765. There is ample record support for Chief Flacco's legitimate nondiscriminatory reasons for realigning the NFU squad supervisors and choosing Lt. Newsome as the new leader of East Squad. Lt. McCrorey's sole proof of pretext is the handful of comments made by Flacco. This evidence is far less inflammatory than what was at issue in <u>Glanzman</u> and is far too thin to raise a question of material fact regarding whether age played a *determinative* but-for role in the supervisor decision.

Because Lt. McCrorey proffered insufficient evidence to support an inference that the reassignment left him worse off or that Chief Flacco's legitimate reasons for exercising his managerial prerogative to move McCrorey to a different geographic squad within the same Unit were pretextual, the District Court's decision on the age discrimination claims should be affirmed.

## II.    The District Court correctly granted summary judgment on Lt. McCrorey's retaliation claim.

Next, Lt. McCrorey alleges the Philadelphia Police Department denied his DROP extension in retaliation for his having filed an EEOC complaint against Chief Flacco. Appx040 (Compl. at ¶ 50, 55); ECF 30-1 (Plf. Resp. Opp. City MSJ, MoL at 15). The District Court appropriately granted summary judgment in the City's favor.

---

forth in <u>Price Waterhouse v. Hopkins,</u> 490 U.S. 228 (1989). However, this Court alternatively held that under <u>McDonnell Douglas</u>, the claim failed for insufficient evidence of pretext. <u>Glanzman</u>, 391 F.3d at 512 n.4.

The ADEA and the PHRA both prohibit employers from retaliating against employees for complaining about unlawful discrimination. See 29 U.S.C. § 623(d); 43 P.S. § 955(d). Retaliation claims under these statutes are analyzed identically under the same McDonnell Douglas burden-shifting framework discussed above: (1) the employee must establish a *prima facie* claim; (2) the employer may then advance a legitimate, non-retaliatory reason for its conduct; and (3) if the employer does so, the employee must then come forth with evidence suggesting that the employer's reason is pretextual. See Daniels v. School Dist. of Phila., 776 F.3d 181, 192-93 (3d Cir. 2015) (analyzing ADEA and PHRA retaliation claims).[9] To demonstrate a *prima facie* claim of retaliation, an employee must show that: (1) he engaged in protected activity; (2) the employer took a materially adverse action against him; and (3) there was a causal link between the protected activity and the materially adverse action. See Id.

There is no dispute here that Lt. McCrorey engaged in protected activity when he filed his EEOC complaint. Appx040 (Compl. at ¶ 50). However, the District Court properly rejected the retaliation claim, as Lt. McCrorey failed to establish several other elements of a cognizable claim. First, Lt. McCrorey was not subjected to any materially adverse action. Second, there is absolutely no evidence of any causal nexus between McCrorey having filed an EEOC complaint against Chief Flacco and the subsequent denial of his DROP extension request by an entirely different arm of the Police Department. Third, he offered no evidence that the City's reason for denying the extension — that his prolonged absence from work rendered him unqualified under neutral criteria that applied to all applicants

— was pretextual.

### A. The District Court properly determined that Lt. McCrorey did not demonstrate materially adverse action.

The District Court correctly determined that Lt. McCrorey did not establish materially adverse action, as no reasonable employee would have deemed the refusal to extend a mandatory retirement date materially adverse where the employee was facially unqualified for the extension.

To make a showing on the second prong of a retaliation claim, the plaintiff must demonstrate "that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Daniels, 776 F.3d at 195, quoting Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Making this determination requires examining the challenged conduct "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Id. "[P]etty slights" and "minor annoyances" are not materially adverse. Id.

Here, undisputed record evidence establishes Lt. McCrorey was facially ineligible for an extension under neutral criteria that applied to all DROP extension applicants. The District Court was correct that, under those facts, no reasonable employee could expect that the Department would do anything *other* than deny the request or deem the denial materially adverse. Appx023-024 (Dist. Ct. Op. 20-21).

There is no dispute that by enrolling in DROP, participants make an irrevocable commitment to retire within four years. See Phila. Code § 22-310(2). It

is also undisputed that extensions are far from guaranteed, as they are permitted under the Philadelphia Code only under "extraordinary circumstances." Id. § 22-310(2)(a). McCrorey himself understood that DROP extensions had to be authorized by the Mayor, and that would only happen in "emergencies" to address a "shortage of manpower." Appx193 (McCrorey Dep. 14:1-5); Appx277 (Ferguson Dep. 46:9-14) (DROP extensions reserved for "circumstance[s] where [the City is] at a deficit personnel wise and . . . [City is] looking to keep additional boots on the ground"). McCrorey also acknowledged that when then-Mayor Kenney authorized a one-year extension for eligible police officers in July 2021, the City informed all prospective applicants that they needed to be "currently able to perform the essential functions of [their] position" and "available to work for the duration of the extended DROP period." Appx216 (McCrorey Dep. 107:14-24); Appx260 (DROP Ext. Form); Appx256-257 (FAQ at 2-3).

As the District Court observed, no "reasonable employee would . . . be dissuaded from engaging in protected conduct for fear of being denied something they had no chance of being granted in the first place." Appx024 (Dist. Ct. Op. 21). Because the record indisputably establishes that Lt. McCrorey was facially unqualified to extend his mandatory retirement date, no reasonable employee would deem this action materially adverse. The District Court therefore correctly determined the retaliation claim failed for want of a materially adverse action. Appx023-024 (Dist. Ct. Op. 20-21).

**B.      The District Court correctly held Lt. McCrorey produced insufficient evidence of causation.**

Further, even if the DROP extension denial is considered materially adverse (it is not), the District Court correctly held that Lt. McCrorey's retaliation claim also fails because he did not meet his burden of establishing causation.

 To establish the third element of a *prima facie* retaliation claim, the employee must show a causal nexus between the employee's protected activity and the adverse action. Absent "close temporal proximity," the plaintiff must show a causal connection under "the circumstances as a whole." Daniels, 776 F.3d at 196. A plaintiff cannot establish a causal connection "without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." Id.

Here, there is absolutely no evidence of any nexus between Lt. McCrorey's EEOC complaint (February 2021) and the denial of his DROP extension request (July 2021). Indeed, five months elapsed between the two -- far too long under this Court's caselaw to be "unusually suggestive" of retaliatory animus. LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) (three month gap not unduly suggestive); Williams v. Phila. Hous. Autho. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (same re: gap of over two months).

Equally important, the record is undisputed that decisions regarding eligibility for DROP extensions were made by then-Deputy Commissioner of Organizational Services Christine Coulter and her then-administrative supervisor Lt. James Ferguson. Appx268-269, 272 (Ferguson Dep. 12:16-22, 13:19-21, 14:7-15:3). Organizational Services is part of an entirely separate branch of the Police

Department and shares no overlap in chain of command with the Narcotics Bureau. Appx106 (Flacco Dep. 76:3-12). As the District properly determined, there is no evidence, and no reason to believe, that either Coulter or Ferguson had any knowledge that Lt. McCrorey had filed an EEOC charge against Chief Flacco at the time they deemed him ineligible. Appx027 (Dist. Ct. Op. 024). Indeed, Lt. Ferguson specifically testified that he had "no [such] knowledge" and nothing in the record indicates otherwise. Appx275 (Ferguson Dep. 40:13-20). Because Lt. McCrorey offered no evidence that the decisionmakers knew of the protected conduct at the time they acted, he did not establish the causation necessary to establish a *prima facie* claim of retaliation. Appx025-028 (Dist. Ct. Op. 22-25), citing Daniels, 776 F.3d at 196.

Lt. McCrorey argues he established a genuine issue of material fact as to causation. Appellant Br. at 26. Yet, the only evidence he points to is his deposition testimony about a phone call he claims to have received. During that call, an anonymous individual, the identity of whom McCrorey "d[id]n't recall," purportedly told him that Chief Flacco "was going to try to deny [his] . . . entry into the DROP program." Appx216 (McCrorey Dep. 108:8-13, 109:9-10).

The District Court was correct in concluding this anonymous phone call is not competent summary judgment evidence. The alleged caller's statement, which McCrorey submits for the truth of the matter asserted, "fails to rise beyond hearsay" and thus cannot be used to defeat summary judgment. Appx027 (Dist. Ct. Op. 27), citing Smith, 589 F.3d at 693 ("hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment");

see also <u>Stewart v. Union Cnty. Bd. of Educ.</u>, 655 Fed.Appx. 151, 157 n.4 (3d Cir. 2016) (unreported) (report describing statements of individuals to a third party, submitted for the truth of the matter asserted, not competent summary judgment evidence); <u>Williams v. Guard Bryant Fields</u>, 535 Fed.Appx. 205, 212 (3d Cir. 2013) (unreported) ("grievance form [stating] that [inmate] was told at an unidentified time by an unidentified person that a new [city] policy prevented him from being prescribed pain killer" could not defeat summary judgment). Moreover, at best, this hearsay goes to whether *Chief Flacco* was aware of Lt. McCrorey's EEOC complaint. However, as we already explained, it was Deputy Commissioner Coulter (with Lt. Ferguson) who made eligibility determinations. And Chief Flacco offered uncontradicted testimony that he neither played a role in DROP extension decisions generally, nor weighed in on Lt. McCrorey's application specifically. Appx106, 145 (Flacco Dep. 76:3-12, 248:6-10). Indeed, he did not even know McCrorey had applied for an extension until after it was denied. Appx145 (247:20-24). Thus, even if true, the statements made in this phone call are irrelevant to establish causation.

### C.    Alternatively, McCrorey produced no evidence suggesting the Department's reason for denying his DROP extension application was pretextual.

Finally, Lt. McCrorey failed to point to evidence suggesting the Department's reason for denying his extension request was pretextual. Although the District Court did not reach pretext, it was briefed below. ECF 25-2, City MSJ, MoL at 17-19; ECF 30-1, Plf. Resp. Opp. City MSJ, MoL at 14-15. This Court may affirm on this independent and alternative basis.

The standard to show pretext sufficient to defeat a motion for summary judgment is discussed at length above so we need not repeat is here. <u>See</u> *supra*, Section I.C. However, in short, McCrorey needed to "present evidence contradicting the core facts put forward by the [City] as the legitimate reason for its decision," which is a "difficult burden." <u>Tomasso</u>, 445 F.3d at 706; <u>Fuentes</u>, 32 F.3d at 765. He did not come close to doing so.

DROP extensions are a limited exception — permissible only under "extraordinary circumstances" and with explicit mayoral authorization — to the rule that an employee's commitment under DROP to retire within four years is an irrevocable decision. Phila. Code § 22-310(2). The purpose of the one-time extension Mayor Kenney authorized in 2021 was to address a dire shortage of police personnel by putting enough "boots on the ground" to adequately address several emergent situations: an increase in crime, the COVID-19 public health emergency and certain large-scale events that were expected to take place in the City. Appx193, 214 (McCrorey Dep. 14:1-5, 98:18-20); Appx277, 279 (Ferguson Dep. 46:9-14, 57:17-18); Appx264 (7/27/2021 Denial Ltr.); Appx081, 355 (City SOF & Plf. Resp. ¶ 140).The Department made it clear that applicants had to be "currently able to perform the essential functions of [their] position" and "able and available for work for the duration of the extended drop period." Appx257 (FAQ at 3); Appx260 (DROP Ext. Form); Appx216 (McCrorey Dep. 107:9-17). Indeed, it deemed this eligibility requirement "essential" to "support the extraordinary circumstances that ma[d]e th[e] DROP extension necessary." Appx257 (FAQ at 3).

Lt. McCrorey's DROP extension request was denied based on the

Department's ministerial application of objective criteria, rather than an exercise of discretion. Lt. Ferguson explained that he and Deputy Commissioner Coulter regarded McCrorey as "not currently able or available to work" because he had been "off sick" for almost a year when he applied and they "belie[ved] that he wasn't coming back to work." Appx274, 277 (Ferguson Dep. 36:8-12, 48:9-14).

Lt. McCrorey presents essentially nothing to rebut this, much less call the "core facts" of the Department's explanation into question. Indeed, his own testimony *supports* the City's legitimate, non-discriminatory reason for denying his DROP extension. Lt. McCrorey acknowledged that he had been out on sick leave since the day after Chief Flacco announced his decision and had given no timetable to return to active duty. Appx 205, 210 (McCrorey Dep. 63:3-6, 85:3-4).

The two arguments McCrorey does make are quickly disposed of.

First, he contends a jury could infer retaliatory animus from the fact that almost all extension requests were granted. Appellant Br. at 25. What Lt. McCrorey omits is that *all* of the applicants that were denied (McCrorey and three others) were out on extended leave and no applicant that was on extended leave was granted an extension. Appx274, 276, 278 (Ferguson Dep. 37:5-11, 42:6-11, 50:1-16). Conversely, another NFU lieutenant who also filed an EEOC complaint against Chief Flacco but (unlike McCrorey) remained at work was granted a DROP extension. Appx084, 360 (City SOF & Plf. Resp. ¶ 158); Appx217 (McCrorey Dep. 111:16-22); Appx106 (Flacco Dep. 75:4-6). In short, this detail hurts rather than helps McCrorey's case.

Second, Lt. McCrorey argues the Department's explanation for denying his

application "conflicts with the requirements listed in the DROP Extension Election Form" and this conflict is enough to establish pretext. Appellant Br. at 24; (ECF 30-1, Plf. Resp. Opp. City MSJ, MoL at 15). Specifically, he claims the application only required work availability during the DROP extension period, *i.e.*, October 23, 2021 to October 23, 2022, not at the time the applications were made in July 2021. Id. Had the Department made "any effort made to reach out to him," McCrorey asserts he would have explained he was only out "at that moment" and was available during the extension period. Id.; Appx260 (DROP Ext. Form); Appx216 (McCrorey Dep. 107:14-7).

First, this amounts to saying that the decision was "wrong or mistaken," which is insufficient to establish pretext. Tomasso, 445 F.3d at 706. Further, the District Court was correct that, in making this argument, McCrorey "mischaracterize[es]. . . the document." Appx024 (Dist Ct. Op. 21). The DROP extension application that McCrorey signed on *July 9, 2021* affirmed that he was "*currently* able to perform the essential functions of [his] position." Appx260 (DROP Ext. Form). Finally, any suggestion that McCrorey was extension eligible is a transparent attempt to have his cake and eat it too. McCrorey repeatedly told the Department — and turned in doctors notes — attesting that he was "too sick" to work for the *entire thirteen months* he was out on extended medical leave. Appx211 (McCrorey Dep. 87:17-97:20); (ECF 25-4, City Exs. 7-11 to McCrorey Dep., Doctor's Notes). He collected 100% of his salary during that time and admits

he never provided the Department with a return-to-work date. Id.[12] To now claim that he would suddenly have been well enough to work on October 23, 2021 rings hollow and anyway is contradicted by the record.

Therefore, even if the DROP extension denial is considered a materially adverse action (it is not) *and* if Lt. McCrorey's met his burden of establishing causation (he did not), his retaliation claim still fails. Summary judgment on this claim should be affirmed because there is no evidence of pretext, *i.e.*, evidence that suggests McCrorey's DROP extension was denied for any reason other than that his prolonged absence from work rendered him ineligible.

---

[12] Had McCrorey worked until his retirement, he would only have been paid out at fifty percent for his remaining sick time. Appx198 (McCrorey Dep. 37:5-8).

## CONCLUSION

For the foregoing reasons, Defendant-Appellee the City of Philadelphia respectfully requests that this Court affirm the District Court's Order granting the City's motion for summary judgment.

Respectfully submitted,

CITY OF PHILADELPHIA
LAW DEPARTMENT
RENEE GARCIA, CITY SOLICITOR

*/s/ Kelly Diffily*
By: Kelly Diffily, Esq.
I.D. No. 200531
Senior Attorney, Appeals Unit
City of Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102-1595
(215) 683-5010 / kelly.diffily@phila.gov
*Counsel for Appellee the City of Philadelphia*

Date: May 10, 2024

## CERTIFICATIONOF BAR MEMBERSHIP AND OF COMPLIANCE WITH RULE 32(a) AND REQUIREMENTS FOR ELECTRONIC FILING

1. Pursuant to the Third Circuit Local Appellate Rule 46.1(e), I hereby certify that I am a member of the bar of this Court.

2. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains **12,097 words** excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

3. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

4. Pursuant to the Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the hard, paper copies of the brief.

5. Pursuant to the Third Circuit Local Appellate Rule 31.1(c), I hereby certify that a virus detection program was performed on this electronic brief/file using McAfee Version 8.7.0i, and that no virus was detected.

*/s/ Kelly Diffily*
Kelly Diffily
City of Philadelphia Law Department

Date: May 10, 2024

**CERTIFICATE OF SERVICE**

I, Kelly Diffily, hereby certify that I caused to be served today the foregoing

**Brief for Appellee** upon the persons and in the manner indicated below:

Electronically, via CM/ECF:

**David M. Koller, Esq.**
davidk@phillyhometownlawyer.com
**Jordan D. Santo, Esq.**
jordans@kollerlawfirm.com
Koller Law LLC
2043 Locust Street, Suite 1B
Philadelphia, PA 19103
215-545-8917
*Attorneys for Appellant John Lt. McCrorey*


*/s/ Kelly Diffily*
Kelly Diffily
City of Philadelphia Law Department


Date: May 10, 2024